**INTERSONG–USA and Enrique H. Chia, Plaintiffs,**

v.

**CBS, INC., SBK April Music, Inc., SBK April Music Holland B.V., Sunny Pop Songs, B.V., Julio Iglesias, Gianni Belfiore, Mario Balducci, Ramon Arcusa, CBS Grammofoonplatten, B.V., Amoretta Investments N.V., Serenade Investments, B.V. Pops Songs, Parcs Corporation N.V., Promal Films, Bel Bel Music, and CBS Records Inc., Defendants.**

No. 84 Civ. 0998(JFK).

United States District Court,
S.D. New York.

Feb. 13, 1991.

Deutsch, Klagsbrun & Blasband, New York City (David Blasband, Jessica Friedman, of counsel), for plaintiffs.

Weil, Gotshal & Manges, New York City (Robert G. Sugarman, Robin E. Silverman, Ann E. Dibble, Joseph P. Salvo, of counsel), for defendants.

Gail I. Edwin, New York City, for CBS Records Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEENAN, District Judge:

This is an interesting and well-tried action for copyright infringement pursuant to the Copyright Act of 1976, 17 U.S.C. Sections 101, *et seq.* Plaintiffs Enrique Chia ("Chia") and his publisher, Intersong–USA Inc. ("Intersong"), allege that the melody of the song "Hey," which was initially recorded by Julio Iglesias ("Iglesias") in late 1979, was copied from Mr. Chia's song "Es."

### FINDINGS OF FACT

Plaintiff Chia is a metallurgist who writes songs in his spare time. (Tr. 15 [1]). Plaintiff Intersong is the publisher of Chia's song "Es," and is now a subsidiary of Time Warner Company. (Tr. 22–23).

Defendant Iglesias is a native of Madrid, Spain and a well-known singer and international recording artist. Iglesias has recorded more than 60 albums since the mid–1970's. Many of his recordings have been "hits" and obtained gold and platinum status. (Tr. 682–84). Defendant Mario Balducci ("Balducci") is an Italian citizen and resident of Milan, Italy. Over the past 20 years he has composed the music to more than 300 songs, of which 130 have been published. (Tr. 304–06). Some of Balducci's songs have been recorded by Iglesias. (Tr. 384; PX m(4) [2]). Defendant Gianni Belfiore ("Belfiore") is an Italian citizen and resident of Rapallo, Italy. He is a lyricist who has written about 250 songs, some 130 of which have been published. Belfiore was trained at the Nautical School in Genoa, was a navigator for six years and later served as a purser with the Italian line sailing on the Michelangelo and Raffaello. (Tr. 530). This work at sea is an important part of the story in this case. Belfiore wrote lyrics for the Italian versions of many of Iglesias' songs which originally were performed in Spanish. Defendant Ramon Arcusa ("Arcusa") is a citizen of Madrid, Spain. Arcusa is a singer and songwriter who, since 1978, has been the arranger and producer for Iglesias. (Tr. 803–06).

Mario Battaini ("Battaini") is an Italian citizen living in Milan, who has been in the music business for many years. Since 1977, he has operated a recording studio in his home. (Tr. 407–08). Mrs. Paola Tagliaferro Rinaldi ("Tagliaferro") is an Italian citizen living in Rapallo. (Tr. 442–43). She had a short career as a singer in Italy from 1978–79, and knew Iglesias, Arcusa, Balducci, and Belfiore during this period. (Tr. 444–45, 455–60). She continues to be friendly with Belfiore. Teresa Lodi ("Lodi") is an Italian citizen and resident of Rapallo. She has been Belfiore's companion since 1977 and lives with him. (Tr. 488–89).

Alina Ross ("Ross"), a resident of Miami, Florida, worked at the Latin American Operations Office of CBS Records, Miami. She was Julie Sayres' secretary during 1978. (Tr. 755). CBS Records Inc. has recorded and released albums by Iglesias since 1978. (Tr. 684).

---

**1.** "Tr." citations refer to the trial transcript and "Dep. Tr." to deposition transcript.

**2.** "PX" citations refer to plaintiffs' exhibits which were received at trial. "DX" citations refer to defendants' received exhibits.

## The Song "Es" and Access

It is undisputed that the song "Es" was written in early 1978 by Dr. Chia (Tr. 23) and that it is copyrighted. (PX g(1), g(2), h(1), h(2)). A demonstration tape of "Es" was prepared by a singer, Grissell Sanchez, in February 1978. (Tr. 33). Chia submitted the Grissell Sanchez tape to Julie Sayres ("Sayres") of CBS Records in March 1978 "for presentation to Mr. Iglesias." (Tr. 37–39). Sayres did not testify either at trial or by way of deposition. She has been identified as the artist and repertoire ("A & R") representative for CBS for Latin American artists, including Iglesias. (Tr. 38; Ross Dept. Tr. 6–8).

As one focuses on what happened to the Grissell Sanchez tape of "Es" that was left at CBS with Sayres and her secretary, Alina Ross (Tr. 39, 40), the picture becomes blurred and hazy. Chia claims that Sayres told him "she would be glad to present" the tape to Iglesias (Tr. 39) and that in the summer of 1978 Chia returned to CBS in Coral Gables where he spoke to Ross and Sayres and was allegedly told that Arcusa, on behalf of Iglesias, had rejected the song although he liked the music to it. (Tr. 41–43). Chia never got that tape back from CBS (Tr. 44). Iglesias acknowledged meeting Sayres five to ten times, but did not know what her job or function at CBS was. According to Iglesias, she played no role in suggesting any songs for him and he never received any tapes from her. (Tr. 695). Arcusa also knew Sayres, but did not know her position at CBS other than that she had contacts with Brazilian performers. (Tr. 815). He also never received any tapes from her, Ross, or anyone else at CBS in the 1970's. (Tr. 814, 816).

Alina Ross' testimony at deposition and trial leaves the trier of fact in a state of bewilderment as to what she really remembers, what she assumes, what she chooses to forget and what light she truly casts on the history of the Grissell Sanchez tape. Ross has worked for CBS, or one of its affiliates, for more than 12 of the last 13½ years. At the time of her deposition on July 25, 1989, she was working for a music company headquartered in Madrid, but by the time of her trial testimony she was working for CBS Discos, Inc. (Tr. 753, 754; Ross Dep. Tr. 4). As we will see, a cynic might speculate that her testimony was influenced by her employment status. In the late 1970's, Ross was Sayres' secretary at CBS. (Tr. 755, 756). While she was Sayres' secretary, Ross met Chia and she typed lyrics of "Es" for him, which he had brought with him in handwritten form. (Tr. 758). This testimony, in part, coincides with Chia's testimony. (Tr. 39). Ross testified at trial that she accepted a tape of the song from Chia in Sayres' absence (Sayres "at the time was away"). (Tr. 758). Ross testified at trial that she did not submit the tape to Iglesias, Arcusa, or any other artist or producer and that she did not know of her own knowledge whether Sayres submitted it to Iglesias or Arcusa or whether either of them rejected it. (Tr. 758, 759). However, in her deposition, she testified at page 15 as follows:

"Q. Do you recollect that during the meeting when the song was returned that the message to Mr. Chia was that it was not accepted by Mr. Iglesias?

A. I know the song was rejected by Mr. Iglesias."

This was but a few answers after page 15 of the deposition:

"Q. Do you have any recollection of the song "Es" being rejected by Mr. Iglesias or Mr. Arcusa?

A. No, I don't."

Her explanation for her deposition testimony is that she was "very nervous." (Tr. 762).

Besides the specific testimony about Iglesias, Arcusa and the "Es" tape, Ross gave the following direct testimony at trial:

"Q. Did Ms. Sayres, or did you, from time to time, receive tapes from composers with the request that they be passed along to artists?

A. Yes.

Q. And what was the normal practice? Was there a normal practice at the time?

A. The normal practice was she would receive them. Sometimes she would listen, sometimes she would not. Usually they were either sent back or just—they were kept in the company.

Q. Was every tape that was received passed along to any artist?

A. No.

Q. Of the tapes that were received, how many of them were passed along to artists?

A. In the Latin American office, none, in reality. None."

(Tr. 756, 757).

The Court concludes that the Ross testimony is of virtually no help in determining whether Iglesias and/or Arcusa had access to the Grissell Sanchez tape of "Es."

"Es" was recorded by Yolandita Monge and Chaliko in 1978. (PX b, d). El Llanto also recorded it in 1979. (PX c; Tr. 29–30, 32). There is evidence that the Monge version of "Es" was played on the radio in New York and Miami in the spring of 1979. (Tr. 51). In addition, there is evidence that "Es" was one of the ten most-played songs on one particular New York radio station, WJIT, in the spring of 1979. (PX i, j, k, l). Iglesias, Arcusa and Belfiore, however, deny having heard "Es" prior to the commencement of this lawsuit. (Tr. 582, 697, 817). None of these defendants testified to having listened to WJIT during the spring of 1979.

On the issue of credibility and access, the Court finds the testimony of Chia concerning his reaction to the revelation that Iglesias had recorded "Hey," which he was told in the late summer or early fall of 1980, most astounding. (Tr. 62–68). Chia testified that an unnamed friend brought him a tape of Iglesias' "Hey" "in the late summer of 1980." (Tr. 65). He played the tape realizing it sounded like "Es," but only played it once. (Tr. 66). He waited seven days before playing "Hey" again, all that week knowing that it sounded like "Es." (Tr. 67, 68). In December 1980, Chia trav-

elled from near Atlanta, Georgia to Miami and then finally bought the phonograph record album of Iglesias' "Hey." (PX m(4); Tr. 63, 64, 73, 74).

Dr. Chia impressed the Court as an educated and intelligent man who has obtained degrees in chemistry, physics, and metallurgy as well as a doctorate in metallurgy, which he obtained from Georgia Tech in 1975. If he had really written "Es" with Iglesias in mind as the artist to perform it, as he testified (Tr. 99), and if he really was told by CBS that Iglesias and or Arcusa had rejected it (Tr. 41–43) after leaving it with CBS for Iglesias to listen to (Tr. 37–39), he would not have listened to "Hey" just once when he first received it. He would not have waited a week before listening to it again and he would not have waited a period of three months before buying the record of "Hey" and even longer before contacting "Es'" publisher, Intersong. (Tr. 68). The Court does not accept the plaintiffs' excuse that Chia was living in Carrollton, Georgia at the time and was unable to purchase "Hey" until he reached Miami, due to the absence of Spanish record stores in Carrollton. (Tr. 1522–23).

The Court concludes that Iglesias, Arcusa, Balducci and Belfiore did not hear "Es" until this litigation began.[3]

### *The Song "Hey" and Independent Creation*

Balducci allegedly composed the music for the basic idea of "Hey" in 1975. (Tr. 307). In 1976, Balducci began to collaborate with Belfiore. (Tr. 307, 532). The first song they wrote together was "Goodbye a Modo Mio," which later was recorded by Iglesias. (Tr. 384).

In 1976, Belfiore allegedly showed Balducci lyrics for a song entitled "Dico Donna," which Belfiore referred to as "I Bastardi Come Te." (Tr. 309, 534–36). After receipt of these lyrics, Balducci claims to have completed the melody of the song that

---

**3.** The Court recognizes that it denied the defense motion to dismiss under Fed.R.Civ.P. 50 at the end of plaintiffs' case, but that was before

all of the evidence had been presented on the issue of whether Iglesias, Arcusa, Balducci or Belfiore had access to "Es." (Tr. 303).

became "Hey." (Tr. 309). According to Belfiore, he thought of the title "I Bastardi Come Te" because of an incident that occurred to him on one of his voyages in 1973 or 1974. One of the women on the ship said to him, "Why do I like bastards like you?" This phrase, "bastards like you," in Italian "i bastardi come te," stuck in his mind and he then used it as a working song title. (Tr. 535, 536, 537). The Court credits this testimony and finds Belfiore believable concerning the origin of the title, "I Bastardi Come Te."

Balducci testified that in October 1977, he recorded the completed song, "Dico Donna," at the recording studio in the basement of the home of Battaini in Milan, Italy. (Tr. 310–11, 411). At that time, Balducci also allegedly recorded the song "Avanti," another song that he had written with Belfiore. (Tr. 310–11, 412). Battaini also testified that in early October, 1977 Balducci, whom he had known since at least 1972, came to his Milan studio and in the presence of Battaini and his daughter, Balducci recorded two songs. (Tr. 410–12). The two songs were entitled, "Avanti" and "Dico Donna" and Battaini had plausible reasons to remember each title (Tr. 412) and the date of the recording session. (Tr. 411). Battaini recognized the song "Avanti" as it was played for him in Court, but he did not remember the tune of "Dico Donna" although he clearly recalls the title. (Tr. 413). In the Court's view, Battaini was an entirely credible witness who impressed as being frank and straightforward. If he were going to lie, he simply would have said that he also recalled the music and some of the words to "Dico Donna."

Thus, the Court concludes that there is no question but that Balducci recorded two songs at Battaini's Milan studio in early October 1977. One of these songs at that time was entitled "Avanti" and contained the melody of the Iglesias song "Amanti." The second song was entitled "Dico Donna."

These numbers were recorded on a tape with a reel at the Battaini studio which did not, in October 1977, have the capacity to make cassettes from a reel and Battaini

gave that reel to Balducci. (Tr. 414). Balducci claims to have made a cassette from the reel given to him by Battaini, and later to have given the cassette to Belfiore. (Tr. 314, 319). Balducci identified the cassette casing, DX 41, as the type of cassette that he "used at home at that time." (Tr. 314). Ms. Lodi testified that she saw the cassette copy at the end of 1977 and heard the songs on that cassette at that time. (Tr. 490). She further testified that she received that cassette from Belfiore (Tr. 490) and kept it with other cassettes in her chest of drawers in the apartment she shares with Belfiore in Rapallo, Italy. (Tr. 492, 498–99, 511). Ms. Lodi discovered the cassette in October 1990, when she was putting the chest in order. (Tr. 492). Upon discovering the tape in October 1990, she notified Belfiore because she thought "it might be of importance for this case" since it contained the "first version of 'Hey'". (Tr. 511–12).

Expert testimony was received concerning the age of the cassette, DX 41, and the tape that had previously been encased within DX 41, now DX 41A. The expert was unable to give a conclusive opinion as to the age of the cassette, but ventured that it was manufactured in the mid–1970's. (Tr. 423–25). The expert did opine, however, and the Court concludes that the tape upon which Balducci allegedly recorded "Dico Donna" and "Avanti" in October 1977 in Battaini's recording studio was recorded in Europe in the mid–1970's. (Tr. 425–26, 432–35).

In the spring of 1978, Balducci and Belfiore visited with Ornella Vanoni, a prominent Italian vocalist, in her dressing room at the Teatro Cantero in Rapallo, Italy where Balducci played two songs for her. They told Vanoni that they had written the two songs and all three testified, Balducci and Belfiore at trial and Ms. Vanoni at deposition, that the songs were "Avanti" and "Dico Donna." (Tr. 330–32, 544–45; Vanoni Dep. Tr. 12). Ms. Vanoni allegedly requested that they send her a tape of both songs (Tr. 332, 545; Vanoni Dep.Tr. 12) and Belfiore arranged with Giusta Spotti of Ariston Records to do that. (Tr. 546). Ms. Vanoni decided not to record either song

and the tape was returned to Mrs. Spotti by Allesandra Perlusz, Ms. Vanoni's secretary. (Tr. 548; Vanoni Dep.Tr. 12; Perlusz Dep.Tr. 11–12).

The Court concludes that there is no question but that in the spring of 1978 Balducci and Belfiore, without a prior appointment and probably by accident, met Ms. Vanoni on a walkway near the sea in Rapallo and that they played two songs for her shortly thereafter in her dressing room at the Teatro Cantero. (Vanoni Dep.Tr. 12). There is, however, some confusion as to what these two songs were. The confusion is caused in part by the fact that at her deposition in Milan on September 13, 1989 Ms. Vanoni identified the two songs on DX 1 as "Amanti," a later version of the Balducci/Belfiore song "Avanti" and as "Chi Piu Amo Sei Tu" which defendants claim is a later version of "Dico Donna" (I Bastardi Come Te) and which they say later evolved into "Hey." (Vanoni Dep. Tr. 13).

It is the testimony of Paola Tagliaferro which this Court believes sheds the most light and is the most persuasive concerning the two songs "Avanti/Amanti" and "Dico Donna/Chi Piu Amo Sei Tu."

Ms. Tagliaferro testified that during July or August 1978, she heard Balducci play and sing "Dico Donna" at his house. (Tr. 335, 445, 550–51). This was nearly one year before "Es" was played on the radio in New York and Miami. *See supra* at 277. At that time, Balducci allegedly wrote out in long-hand the lyrics of "Dico Donna" which Tagliaferro took with her. (Tr. 335–36, 445, 454; DX 61). She had written on a corner of the handwritten lyrics the musical chord in which she preferred to sing, and this facilitates her identification of it. (Tr. 470–71). Tagliaferro also received a copy of the recorded version of "Dico Donna," which Balducci had made in the Battaini studio, (Tr. 551), and she used this tape to "study" the song. (Tr. 468).

Between December 14 and 17, 1978, Iglesias was in Milan to perform for an Italian television special. (Tr. 457). It was during this visit to Milan that Iglesias met in his hotel suite with Balducci, Belfiore and Ta-

gliaferro. (Tr. 340–41, 456–58, 557–58, 690). On that occasion, Balducci allegedly played some songs that he and Belfiore had written. These included "Dico Donna" and "Avanti." (Tr. 340, 458, 558). Iglesias is said to have liked both "Dico Donna" and "Avanti" and he suggested some changes to "Dico Donna." (Tr. 342, 459). Iglesias told Belfiore and Balducci that he wanted to record both songs and asked Belfiore to write new lyrics. (Tr. 559).

Belfiore thereafter wrote new lyrics to "Avanti" and "Dico Donna." (Tr. 561). These new lyrics were entitled "Amanti" and "Chi Piu Amo Sei Tu." (Tr. 560). Balducci then recorded both songs at the GRS Recording Studio in Milan, Italy in April or May, 1979. (Tr. 638; DX 20). It is claimed that Belfiore gave a cassette copy of that recording to Iglesias. (Tr. 345–46, 559, 561). The music of "Chi Piu Amo Sei Tu" differs somewhat from the music of "Dico Donna" in that it reflects some changes suggested by Iglesias in Milan in December, 1978. The music and lyrics to "Chi Piu Amo Sei Tu" were deposited by Belfiore and Balducci with the Italian copyright society on August 7, 1979. (DX 17).

The Tagliaferro version of the December 1978 Milan hotel meeting in Iglesias' suite is convincing (Tr. 455–60) and it ties in with her testimony that she heard Balducci play and sing "Dico Donna" in the summer of 1978. (Tr. 445). This meeting and the opportunity for her as a young artist to sing privately with Iglesias is something she would remember. It is convincing and credible because as she testified she had expected and wanted to perform "Dico Donna" but when Iglesias first heard it, he expressed a liking for it and a desire to perform it. (Tr. 445, 455, 458, 459). This occurred when Tagliaferro was a young singer of 19 years, a rookie, and the "great" Iglesias was taking the song she wanted to do. That is an event a youngster would remember, particularly when a world-class artist was going to sing her number. Since she identified the song at the December hotel meeting as the same one Balducci had played for her in the summer of 1978 and since she recalls "Dico

Donna" and saved the lyrics thereto in her "dream chest" (Tr. 446), the Court accepts the fact that "Dico Donna" and its music existed as early as the summer of 1978 when Balducci played it for Tagliaferro at his house.

The Court rejects the plaintiffs' arguments that "the song . . ." Dico Donna ". . . never existed . . . with the 'Hey' music" and "that no song with the title 'I Bastardi Come Te' ever carried the 'Hey' music." (Plaintiffs' Closing Argument at 8). The Court notes that DX 61, the lyrics of "Dico Donna" supplied to Tagliaferro in the summer of 1978, *see supra* at 279, contain both the words "i bastardi come te" and "dico donna."

Were the defendants seeking to mislead the Court concerning the development of "Dico Donna"/"I Bastardi Come Te" to "Chi Piu Amo Sei Tu" to the ultimate song "Hey," the Court does not believe that they would further complicate the story with the development of "Avanti" into "Amanti." Adding "Avanti/Amanti" to the case does nothing but confuse it unless those two songs really existed along with the three songs in the "Hey" evolution line. It is true that several pre-trial submissions by the defense omitted the title "Dico Donna" but the Court is persuaded, particularly by the Battaini and Tagliaferro testimony, that this was one of the two titles by which the "Hey" music originally was known. Thus, the Court concludes that Balducci did originally write the basic music for "Hey" in 1975 and that he and Belfiore did collaborate on it thereafter as they testified (Tr. 307, 308, 536),[4] and that the music recorded by Balducci as "Dico Donna" at Battaini's studio in Milan in October 1977 contained the basic melody of "Hey."

Iglesias used the music of the "Chi Piu Amo Sei Tu" version to write original Spanish lyrics for "Hey." (Tr. 691). Iglesias gave a cassette of "Hey" to Arcusa for him to do arrangements of the song. (Tr. 807–08). The music of "Hey" is practically identical to the music of "Chi Piu Amo Sei Tu," which is substantially similar to the music of "Dico Donna." (Tr. 1060, 1154). "Hey" was recorded by Iglesias in late 1979 and released by CBS Records in 1980. (Tr. 823; PX m(4)).

The Court notes that Iglesias has a practice of sharing credits with other people who work on songs with him. (Tr. 698–99). The credits to "Hey" list Iglesias, Balducci, Belfiore and Arcusa. (PX m(4)). Each of the songs on the "Hey" album is attributed to its contributors, and Iglesias is never listed as the sole creator. (PX m(4)). The same is true for each of the songs included on the "Amanti" album. (PX m(6)).

### *"Es" and "Hey" and Substantial Similarity*

As the Court observed in its Opinion and Order of March 20, 1985, there is similarity between the music of "Es" and "Hey." They do sound and are similar in some respects because they both use a descending scale step motive in the verse. (Tr. 970). Such a descending scale step motive, however, is not uncommon and has often been used as a compositional device. Iglesias has incorporated this device in many of his recordings. (Tr. 1037–38). There also are similarities in the structural patterns, chord progressions and the pitch of each song. Those structural patterns and chord progressions, however, also are common, (Tr. 1026–27, 1030–31, 1032–36), and the pitch is based on common compositional techniques. (Tr. 970–72).

Although there are similarities, there are many substantial dissimilarities in the pieces.

The experts on each side who testified as to the similarities and differences in the music were impressive. They were Dr. Earl Spielman, a forensic musicologist for plaintiffs, and Daniel Ricigliano, the Chairman of the Theory Department at the Manhattan School of Music, for the defense. Mr. Ricigliano was less of a "cheerleader"

---

**4.** Originally, Belfiore wrote lyrics for a song written by another composer, Toscanni, the music of which was different from "Hey" but which had the title "I Bastardi Come Te." The Belfiore/Toscanni song employed different words than the "Dico Donna/Bastardi" version co-authored by Balducci and Belfiore. (Tr. 534, 535).

than Dr. Spielman and the Court accepts his opinion "that both of the compositions were independently created." (Tr. 959, 963).

The choruses of the two songs are quite different. True, each song does contain a sequence of descending notes, but such a sequence is common and found in "Welcome to My World," "The Greatest Performance of My Life," and Iglesias's own song, "Preguntale." (Tr. 1010–11). The chorus of each piece has other notes which are more important and are different. (Tr. 999–1004). In addition, "Es" employs the same descending scale step motive as it employed in the verse, while "Hey" employs an ascending scale step motive. (Tr. 1007). Parts of the harmonies of the two songs are similar, but they use a common progression. Among other songs which use such a progression is "Somewhere Over the Rainbow." (Tr. 1025, 26). The remainder of the harmonies of the two songs are different. In both the verse and the chorus, "Es" contains a much more complicated chord progression which sounds very different from the chord progression of "Hey." (Tr. 1021–31).

The Court concludes that each song employs some similar compositional devices, but those compositional devices are not uncommon. "Es" does not combine those compositional devices in a unique or unconventional manner, and "Hey" does not combine those compositional devices found in "Es" in a similar manner.

## CONCLUSIONS OF LAW

The parties agree that in a copyright infringement action, plaintiff may prove copying indirectly by showing: (1) the defendant had access to the plaintiff's work; and (2) there exists between the two works substantial similarity of protectible expression. 3 M.B. Nimmer, *Nimmer on Copyright*, § 13.0[B] at 13–8 (1990). More simply stated, the plaintiff must show that his work "was 'copied,' by proving access and substantial similarity between the works, and also show that his expression was 'improperly appropriated,' by proving that the similarities relate to copyrightable material." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986) (citations omitted).

### Access

Access is hearing or having a reasonable opportunity to hear the plaintiff's work, in other words having the opportunity to copy. *Bevan v. Columbia Broadcasting System, Inc.*, 329 F.Supp. 601, 604 (S.D.N.Y.1971); *Smith v. Little, Brown & Co.*, 245 F.Supp. 451 (S.D.N.Y.1965), *aff'd*, 360 F.2d 928 (2d Cir.1966). A plaintiff must offer significant, affirmative and probative evidence to support a claim of access. *Scott v. Paramount Pictures Corp.*, 449 F.Supp. 518, 520 (D.D.C.1978), *aff'd*, 607 F.2d 494 (D.C.Cir.1979), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980). Conjecture or speculation of access will not suffice. *Alexander v. Irving Trust Co.*, 132 F.Supp. 364, 367 (S.D.N.Y.), *aff'd*, 228 F.2d 221 (2d Cir.1955), *cert. denied*, 350 U.S. 996, 76 S.Ct. 545, 100 L.Ed. 860 (1956).

In the instant case, plaintiffs base their claim of access on Chia's submission of a tape of "Es" to CBS employees in the spring of 1978 and the fact that "Es" was played on the radio in New York and Miami during the spring of 1979 and achieved some popularity. There is testimony from Chia that he was told that Iglesias or Arcusa had rejected the tape, but such testimony is not sufficient to allow the Court reasonably to infer access. Iglesias and Arcusa testified that they did not receive any tapes from CBS at this time and had never heard a tape of "Es" or heard of Chia prior to the commencement of this suit. Moreover, Chia's testimony on this issue is not persuasive, *see supra* at 277, and Alina Ross' testimony is of no help. *See supra* at 276–277.

Plaintiffs' claim of radio access is supported by a paucity of evidence. "Es" may have been played on the radio in New York and Miami in 1979 when Iglesias, Arcusa and Belfiore were in those cities, but there is an insufficient basis to conclude that any of them heard the song at that time. Each of these defendants denies having heard

"Es" prior to the commencement of this suit. (Tr. 363, 697, 748–749, 752, 816–817). The Court has been given no reason to doubt the veracity of these representations.

The Court concludes that plaintiffs have failed to prove access to "Es" by any of the defendants prior to the creation of the music for "Hey."

### Substantial Similarity of Protectible Expression

■ In *Arnstein v. Porter*, 154 F.2d 464 (2d Cir.1946), the Second Circuit set forth a two part test for determining the issue of substantial similiarity. As stated in *Walker*, the *Arnstein* decision "framed a two-part test for similarity by drawing a distinction between noninfringing 'copying' on the one hand, which may be inferred from substantial similarities between the two works, and infringing 'illicit copying,' on the other, which demands that such similarities relate to protectible material." *Walker*, 784 F.2d at 51. On the issue of copying, the Second Circuit has held that " 'analysis (dissection) is relevant, and the testimony of experts may be received.' " *Walker*, 784 F.2d at 51 (quoting *Arnstein*, 154 F.2d at 468). If copying is established under this first inquiry, only then does the Court consider the issue of illicit copying. On that issue " 'the test is the response of the ordinary lay listener' " and expert testimony on this issue is inappropriate. *Walker*, 784 F.2d at 51 (quoting *Arnstein*, 154 F.2d at 468). *See generally* Note, *The Role of the Expert Witness in Music Copyright Infringement Cases*, 57 Fordham L.Rev. 127 (1988–89).

The Court accepts the conclusions of defendants' music expert, Anthony Ricigliano and finds that plaintiffs have not established that defendants copied "protectible expression" contained in plaintiffs' copyrighted work. *Walker*, 784 F.2d at 48. The second issue, illicit copying, therefore need not be reached.

As was ably demonstrated by Mr. Ricigliano, "Es" and "Hey" do contain common elements. Both use a descending scale step motive in the verse. (Tr. 970). This descending scale step motive, however, is a commonly used compositional device. Not only is this device found in "Twinkle, Twinkle Little Star," but the identical note progressions found in "Es" and "Hey" also are found in compositions entitled "Amore un Altra" and "Without You." (Tr. 971–72). In addition, Iglesias has incorporated this device in many of his recordings. (Tr. 1037).

Other similarities between the songs include their structure patterns, their use of a certain harmonic progression and a recurring eighth note rhythm. As indicated in the Court's Findings of Fact, *see supra* at 280–281, however, these common elements are found in many other well-known songs. (Tr. 1026–27, 1030–31, 1032–36). The elements and techniques used in the compositions, then, contrary to the Spielman testimony, are unoriginal and constitute "scenes a faire," or ordinary, unprotectible expression. *See Walker*, 784 F.2d at 50; *Reyher v. Childern's Television Workshop*, 533 F.2d 87, 92 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976).

The Court concludes that the plaintiffs have not met their burden of proving substantial similarity of protectible expression.

### Independent Creation

■ The Court has concluded that "Hey" was independently created, having evolved from "Dico Donna/I Bastardi Come Te" and "Chi Piu Amo Sei Tu." *See supra* at 279–280. Had plaintiffs established access and substantial similarity of protectible expression, defendants could rebut an inference of copying by proving that the work was created independently of the plaintiffs' work. *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 501 (2d Cir.1982); *American Greetings Corp. v. Easter Unlimited, Inc.*, 579 F.Supp. 607, 613 (S.D.N.Y.1983). Plaintiffs have not established access or substantial similarity of protectible expression. *See supra* at 281–282. In any event, the Court concludes that the essential "Hey" music was written by Balducci in Italy between 1975 and 1977, therefore preceding plaintiff Chia's creation of "Es."

## CONCLUSION

The Complaint is dismissed and Judgment shall be entered for the defendants. This action is to be removed from the active docket of this Court.

SO ORDERED.