**NEW LINE CINEMA CORPORATION & New Line Productions, Inc., Plaintiffs,**

v.

**RUSS BERRIE & COMPANY, INC., Defendant.**

No. 94 Civ. 6339(RO).

United States District Court, S.D. New York.

Sept. 7, 2001.

Stephen F. Huff, Michael G. Goldberg, Pryor Cashman Sherman & Flynn, LLP, New York City, for plaintiffs.

Trent S. Dickey, Ross N. Herman, Sills Cummis Radin Tischman Epstein & Gross, New York City, for defendant.

## OPINION & ORDER

OWEN, District Judge.

Plaintiffs New Line Cinema and New Line Productions (collectively "New Line") filed this copyright and trademark action in September 1994. After understandable delaying events, I presided over a two-day bench trial in April 2001. New Line claims that defendant Russ Berrie & Company's sale, essentially in 1993, of the "Ghostly Gasher," a toy glove with protruding knife-like plastic blades, infringed and diluted New Line's intellectual property rights originating from the "Nightmare on Elm Street" series of motion pictures, specifically a glove worn by Freddy Krueger, the film's main character; and equally important is the issue of alleged damages based on New Line's claims that the infringement was intentional.

New Line, a Delaware corporation with its principal place of business in New

York, is in the business of financing, producing and distributing motion pictures and exploiting the intellectual property rights related thereto. Defendant Russ Berrie & Company ("RUSS") is a New Jersey corporation engaged in, among other things, the business of marketing and distributing gifts and novelty toy items. Russell Berrie is the CEO and Chairman of RUSS, and has been in the toy and gift business for nearly forty years.

The parties stipulated to the following facts and certain conclusions of law, including that RUSS' Ghostly Gasher is substantially similar to the Freddy Glove (discussed hereafter) and constituted trademark infringement. Between 1985 and 1996, New Line released seven films in the "Nightmare on Elm Street" series. The principal character in each of the films is Freddy Krueger, a psychotic killer with a distinctive physical appearance: a scarred face distorted by severe burns, a battered fedora hat, a red and green striped sweater, and a leather glove with razor-sharp knives protruding from the fingers designed to slash his victims to death (referred to as the "Freddy Glove"). The Nightmare Series has enjoyed significant financial success through worldwide box office, home video and pay television revenues. The success of the Nightmare Series has spawned significant additional licensing and merchandising revenue from products including books, costumes, t-shirts, hats, gloves, tattoos, comic books, jewelry, toys, trading cards, stickers and candy. One such item of merchandise is a replica of the Freddy Glove worn by the main character in the Nightmare Series.

It is further undisputed that New Line is the sole and exclusive owner of a valid, federally registered trademark in "A Nightmare on Elm Street" and in the "Freddy Character." New Line licensees commenced selling the Freddy Glove in 1987. Directly and by assignment, New Line is currently the sole and exclusive owner of the copyrights in and to each of the films in the Nightmare Series. Each of the copyrights in the Nightmare Series is presently valid and subsisting, and was at all times affecting the matters addressed at trial.

RUSS has been marketing and distributing gift items since 1963. Beginning in 1993, RUSS began selling a product in interstate commerce with the same overall appearance as the Freddy Glove called the "Ghostly Gasher," stipulated, as observed, to be substantially similar to New Line's Freddy Glove. However, there is no allegation that RUSS made use of the plaintiffs' trademarked names.

By letter dated June 30, 1993, New Line's counsel wrote to RUSS demanding that the company "[c]ease and desist the manufacture, marketing, distribution, sale and/or any other exploitation of the Infringing Glove immediately." The letter, addressed to Curtis Cooke, President of RUSS, stated:

We are the attorneys for [plaintiffs]. New Line owns or controls all rights, including but not limited to the copyright, in the Freddy Krueger character, the featured character in the "Nightmare on Elm Street" series of motion pictures. We have been informed by our client that you are distributing the [Ghostly Gasher] without proper license or authority, which exploitation infringes upon New Line's rights, including but not limited to its copyright.

Demand is hereby made that you cease and desist the manufacture, marketing, distribution, sale and/or any other exploitation of the [Ghostly Gasher] immediately. In addition, it is the policy of the firm to avoid litigation whenever possible. Accordingly, contact the undersigned immediately to discuss an am-

icable resolution of this matter. Failing the foregoing, we are authorized to institute legal proceedings.

By letter dated July 23, 1993, RUSS' President responsed to the cease and desist letter, stating:

I have received your June 30, 1993 letter in which you allege that the Russ Berrie and Company, Inc. Ghostly Gasher Glove (Item No. 1497) infringes upon the rights or your client New Line Cinema Corporation.

Although you state that New Line owns the rights in the "Freddy Krueger" character and the "Nightmare on Elms Street" film series, your letter fails to describe the infringement claimed by your client. Russ Berrie and Company, Inc. does not use either "Freddy Krueger" or "Nightmare on Elm Street" in any advertising, packaging or display material in connection with the sale of the Ghostly Gasher Glove product.

In order to evaluate your claim, we need more information on the alleged infringement. Please provide us with samples of any products upon which you base your claim of infringement. If these products are copyrighted or trademarked, please provide copies or samples of the deposit materials.

It is undisputed that there was no further written correspondence regarding the "cease and desist letter." New Line never responded to RUSS' request for copies or samples of the deposit materials, that is, plaintiff never sent the Freddy Glove to RUSS for examination. Finally, the parties agree that RUSS' gross revenue from sales of the Ghostly Gasher was $49,669.

The principal issue for me to resolve, indeed the reason for this whole bench trial, is whether or not RUSS' copyright and trademark infringement of the Freddy Glove was willful. Virtually all of the evidence addressed this issue. For example, David Imhoff, from New Line, testified as to the widespread success of the Nightmare motion pictures, television shows, merchandise, etc. David Bertolino and Steven Cohen testified that the Freddy Glove was a "must have" item and featured at many toy industry trade shows.[1] This testimony was all geared towards proving the proposition that "Nightmare on Elm Street" and the Freddy Glove were so amazingly popular that there was no way an individual like Russ Berrie, a sophisticated long-term player in the toy and gift industry, could possibly have been without knowledge of their existence when he purchased and, subsequently, marketed and sold the Ghostly Gasher. The facts surrounding RUSS and Russ Berrie's development and sale of the Ghostly Gasher merit some detailed discussion. Berrie testified as follows:

Q. How did [RUSS] come to sell the Ghostly Gasher glove that has us here today? Tell me the background, if you would, of the Ghostly Gasher from Russ Berrie's standpoint?

A. Halloween is a novelty season. So generally on Halloween, for instance, the masks are just—well, they're not masks, but the items I just talked about, the nose with the glasses and the pig nose and things, those were bought on the open mar-

---

1. Bertolino and Cohen, experienced players in the toy industry, based their testimony on their contacts with other industry participants, attendance at trade shows and reading trade publications. Neither, however, had any personal knowledge as to whether Russ Berrie actually attended trade shows where the Freddy Glove was displayed and could not state that Berrie had seen the Nightmare motion pictures or that they had seen him at said trade shows.

ket. Because it's a short season and it's not a big season for us, it was important for us to try and find things out in the marketplace that might fit into this novelty season. I would go with members of my staff to Taiwan, as I said, four times a year, and there we would have our own people out looking at either some of the factories that we deal with or visiting trading companies, looking for products that might fit in, and they would bring it back and there would be, oh, I don't know—there would be 30 different products, it depends on the year—that they would offer anywhere from funny looking balls or to squeeze items or to the Ghostly Gasher, which was the product that we saw there. I thought it was novel, it was different, it was scary. So we bought it.

Q. Who did you buy it from?

A. We bought it from a factory we were doing business with called Selico.

Q. Did you give the manufacturer instructions as to how to create this glove, sir, deign or create it yourself?

A. No, that was a product that was there already. The only thing that we did was to create the—they had a card, I don't think it came in a display, so I think it was just the head card, it goes into the bag.

Q. Packaging, the packaging basically?

A. The packaging, right.

Q. At the time you all bought this Freddy Krueger glove in Taiwan, were you aware of the Freddy Krueger character?

A. No, I was not.

Q. Did you know what the Freddy Krueger of the Nightmare on Elm Street movies were about?

A. I had heard of Elm Street. I didn't know it was Nightmare of [sic] Elm Street, but I had heard of that movie somewhere along the line—but no, I do not know what it's about.

Q. Did you know that the plaintiff New Line Cinema or the other plaintiff in this case had rights or claimed rights in this Ghostly Gasher glove that you saw in Taiwan?

A. No. I absolutely would not have bought it if I did.

Q. Did anyone in your product development group ever tell you or advise you that the plaintiff might have rights in the Ghostly Gasher glove?

A. No.

Q. At this point in time would you meet regularly with your product development people?

A. Sure.

The Court: You want to rephrase that? I take it—how many people went with you to Taiwan?

The Witness: I believe about four.

The Court: You and three others?

The Witness: Well, it was Jimmy, Jennifer, Ricky—I will say three or four, plus myself.

The Court: Okay.

The Witness: And we had our staff over there. In those years in Taiwan we had a staff of, I would guess about 60 or 70 people. Some of them were designers, some of them were sourcing people, some of them were inspectors that would go to the factories and so forth.

The Court: And these are people that are on your payroll?

The Witness: Yes.

The Court: Okay, I take it there came a day you were there, somebody walks in with what ends up being the Ghostly Gasher article.

The Witness: Yes.

The Court: Somebody comes in, puts it on the table and says—

The Witness: Well, it wasn't—what we do is we have a meeting the first day where they present all of the new products that were created by our staff, whether it was created in New Jersey or by design staff in Taipei. We review all of those to say whether we like the product or not. If we like the product, then we send it out to the factory to cost out. Then they have about, again it depends, but approximately about 30 different open item products. And we weren't just doing Halloween at that time. We were doing, it's done in October, the year before Halloween—so you're also doing Christmas. But then we look at all of the different products that they have from the open market then we decide if there are any that we like or there may be some that we may want to make certain changes to make it even better, or some we might say, okay, we like it just the way it is, and so we select those. Then they go out to the factories and the factories then come to the office and we, in the next few days, we negotiate the prices with the factory on these items.

The Court: Now this Ghostly Gasher I take it first came to your attention, what, October, a year before you ended up getting it put on the market?

The Witness: It would have been, I believe, in October of '92. I think we first introduced it for Halloween in '93, if I'm correct. Then it would have been October '92.

The Court: So you and several people are out there, and correct me if I'm wrong, and you're sitting around a table and this item is put on the table.

The Witness: Actually we stand up because all the items are on shelves, so we stand up and we look, and then no, we don't like that, no, no, what about this, yes, this looks like one, and then from there they have the factories come in to quote his price.

The Court: Do you have any specific memory of standing and looking at this item on shelf and saying yes? Maybe you don't, I don't know.

The Witness: Well, I believe I do.

The Court: Obviously you didn't say—

The Witness: Obviously, that's the only way we do it. So, you know, I believe that's true.

The Court: All right, but then the question that is of some consequence here is, you and, what, two or three other guys are all looking at it?

The Witness: Well, no. We had one gal there Jennifer, Ricky, Jimmy, and one other person, I believe, who I'm not sure was with us on the particular trip, but usually there's one other person that might be a designer back from New Jersey, and the people that are involved in product development and sourcing in the Taipei office. So there must have been about 12 or 14 people.

The Court: Okay, but obviously there weren't 12 or 14 people crowded around this one shelf?

The Witness: No.

The Court: That's an awful lot of people.

The Witness: No, they were standing in the room. Most of the time these people that were there were product

people and they were just taking notes to make sure they follow up.

The Court: Who is the one who's saying yes? Is it a collective yes or just you?

The Witness: It would have been—I would believe it would be primarily me, though often times, in fact more often than not I would say to this group, well, do you like this, what do you think of this.

The Court: You'd say what do you think?

The Witness: Right.

The Court: Something like that?

The Witness: Right.

The Court: And so you come to this item. Do you have, as you sit here today, a memory of looking at that item and going through this process with that item?

The Witness: I am sure it happened that way, but I don't have a specific recollection.

The Court: Okay. Do you have secondarily to this any memory of anybody saying—do they call you Russ or do they call you Mr. Berrie?

The Witness: Russ—well, some call me Mr. Berrie. I prefer Russ.

The Court: Do you ever recollect anybody saying, hey Russ, or hey Mr. Berrie, there is an item from that Elm Street thing?

The Witness: Absolutely not.

The Court: Do you have any memory of that at all?

The Witness: No. In fact, you know, there are times that might happen. As an example, we had a ball presented to us once that people were familiar with that was in the market in the U.S. It was a ball with like a face on it, sort of squishy, and we had the factory and they said they created this design, these products, and we said but we believe that there is a competitive product out in the market that looks very very similar to this, or the same idea. We were, you know, obviously, we're careful as far as our infringement is concerned. But they insisted that they design the product, and I had them sign a letter that would indemnify us on this particular product because someone had mentioned to me that they had seen the product.

The Court: So you have no recollection of anybody saying to you, Hey Russ, we've seen this?

The Witness: No. On Ghostly Gasher, no.

(Tr., dated April 24, 2001, at 59–66.) I probed one last issue with Mr. Berrie. Curious as to whether it was possible that one of his colleagues knew about the Freddy Glove and "Nightmare" motion pictures, I asked him the following question:

The Court: Let me ask one follow-up question. I suppose I shouldn't ask you this question, but are you the kind of a boss where the staff has any hesitancy about saying, hey, you're wrong?

The Witness: I don't know whether you've read the message boards on Yahoo where the people, you know, it's like a chat room. I'm a devil.

The Court: You're a devil?

The Witness: Right.

The Court: That means they don't have any hesitation saying, hey Russ, you're making or we're making a mistake with this?

The Witness: The answer to this is, one of the things through the years that I have pleaded with people, you know, is why don't you tell me, why don't you say something, not necessarily about what is supposedly a knock off,

but if a product is not selling well off the counter, the quicker I know about it, the faster I could do something about it. On the other hand, if a product is hot, sometimes I don't find out about it until a month later and therefore that's a month longer that we'll be without the product. So I plead with whether it be my salespeople or my product people or other people to keep me in the loop. It doesn't always work.

(*Id.* at 66–67.) The remainder of Mr. Berrie's testimony was exactly the same. He did not know about Freddy Kreuger or "Nightmare on Elm Street." Here, damages revolve around whether or not I credit his testimony. Essentially, should I determine that the infringement was "willful"—meaning Berrie knew about "Nightmare on Elm Street" and the Freddy Glove and nevertheless continued selling and marketing the infringing Ghostly Gasher—the damages will be considerably different than those resulting from "innocent" infringement.

Although Berrie was not the strongest on all details, I found his testimony credible based on my observation of his demeanor, the substance of his testimony and its relationship to basic principles of common sense. Specifically, I do not believe he had any personal knowledge about the Freddy Glove, the "Nightmare" motion pictures or the intellectual property rights flowing therefrom. I do observe, however, that given the testimony from Bertolino, Cohen and Imhoff (not to mention the thick stack of press from widely-disseminated newspapers), that while possibly someone at RUSS had knowledge and/or awareness of Freddy Krueger and the "Nightmare" films, query whether such knowledge extended to (1) the copyrightable details of the Freddy Glove and/or (2) that it was infringingly duplicated by an unsuccessful short-term item of the thousands that RUSS marketed. Thomas Sancetta, a RUSS employee since 1987, did testify at his deposition that he was aware of the Freddy Krueger character and the "Nightmare" motion pictures, but he was not asked (1) if he had the copyright background to know what constitutes an infringement, or (2) if it occurred to him to question whether the Ghostly Gasher might be an infringement. In any event, this was not explored on his deposition, which reads:

Q. By the way, did you ever see a Nightmare on Elm Street movie?

A. Yes.

Q. When was the first time you saw one?

A. The first time it was on cable, probably 15 years ago, whenever the first one was out.

Q. And were you aware from watching that movie or otherwise of the look of the character Freddy Krueger in that film?

A. Yes.

Q. You were aware he wore a glove similar to the Ghostly Gasher?

A. Yes.

(Sancetta Dep., dated September 1, 1999, at 24–25.)

New Line asks this Court to make a finding of willfulness with regard to infringement, but such a finding is particularly inappropriate in the context of this case. There is no question that New Line sent RUSS a somewhat fenced cease and desist letter. But, that is all they did. RUSS promptly responded by requesting more details, specifically, asking New Line to send a sample of the Freddy Glove. New Line never did so. It is a stretch to label defendant's infringement willful where the plaintiff was asked to provide concrete support for its claim of infringe-

ment and RUSS was to its knowledge doing no more than simply trying to ascertain whether infringement was an issue. This is not just conjecture. The record and arguments of counsel support such a common sense conclusion, especially as it pertains to industry practice. For example, Berrie testified that he never actually saw the Freddy Glove until it was presented to him during discovery by his lawyers. Further, Berrie testified that RUSS (and others) typically responded to cease and desist letters by investigating:

Q. [Mr. Huff] What was done as a regular rule when a letter came in like the June 30, 1993 [cease and desist] letter from the attorneys for New Line?

A. [Mr. Berrie] As I explained this morning, I gave you an example of a product we have called Fluttering Friends, where we ask for samples. In this case we got a catalog and it was totally different. But we generally will ask to see a sample of what they are claiming that we are infringing.

Q. And you read the letter and you had no idea what they were claiming about; correct?

A. That's correct.

(Tr. at 108.)

\*    \*    \*    \*    \*    \*

Q. I'm not going to read the whole letter to you, sir, but it states in its first paragraph, we have been informed by your client that you're distributing the above-referenced item 1497. Up at the top of the letter it says, Re: Ghostly Gasher glove, item number 1497. Down here it refers to it as the infringing gloves without proper license or authority, which exploitation infringes upon New Line's rights, including,

but not limited to, its copyright. Then it goes on with the demand. Do you recall looking at your catalog to see if this was the item that was, if it contained the item referred to?

A. I would imagine I probably did.

Q. Did you instruct anybody to do any further inquiry about the pedigree of that particular item?

A. Well, as mentioned, I asked [Curtis] Cooke to send a letter to get a sample so we could compare the two.

(Tr. at 113.)

\*    \*    \*    \*    \*    \*

Q. [D]on't you have a practice of advising your manufacturers that they have to avoid infringing the rights of others?

A. Yes.

(Tr. at 114.)

\*    \*    \*    \*    \*    \*

Q. [S]o I mean, bringing that particular state of mind to the receipt of this letter, wasn't there anything else you wanted to do? Is there any salesperson you wanted to ask about does New Line have a glove like this?

A. Normally when a company claims infringement and you say to them send me a sample so we could compare, you get it back within a few days. I know that happens when we are sending a cease and desist letter, a company will say, well, send me the sample. We send them the sample. It's a normal thing that's done in the industry.

(Tr. at 116.) When I took up the point with New Line's counsel, he conceded that "plenty" of cease and desist letters are without legal merit:

The Court: [H]ow many people send cease and desist letters that have no basis for it at all except to try to scare somebody?

Mr. Huff: Plenty.

(Tr. at 125.)

Given the foregoing, I turn to the legal issues before me: first, liability and damages on plaintiffs' copyright claims, and, second, damages for defendant's admitted trademark infringement.

■ To establish copyright infringement, New Line must prove (1) ownership of a valid copyright and (2) unauthorized copying by RUSS of the protected and original elements of plaintiffs' copyrighted materials. *See Fonar Corp. v. Domenick,* 105 F.3d 99, 103 (2d Cir.1997); *Queenie v. Hot Stuff, Inc.,* 102 F.Supp.2d 512, 513 (S.D.N.Y.2000); *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.,* 482 F.Supp. 980, 984 (S.D.N.Y.1980). RUSS, as observed, has stipulated that New Line owns a valid copyright and that the Ghostly Gasher is substantially similar to the Freddy Glove, but disputes whether copyright protection in the "Freddy Krueger" character and the "Nightmare on Elm Street" motion pictures extends to Freddy's glove. I am persuaded, as other courts have been, that the Freddy Glove is entitled to copyright protection because "[c]opyright protection is extended to the component part of the character which significantly aids in identifying the character." *New Line Cinema Corp. v. Easter Unlimited, Inc.,* 17 U.S.P.Q.2d 1631, 1633 (E.D.N.Y.1989) (citing *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979)).

■ I conclude that even though RUSS' actions were innocent and devoid of willfulness, the defendant nevertheless engaged in unauthorized copying of the Freddy Glove based on the stipulation that the Ghostly Gasher is "substantially similar" to the Freddy Glove and also on my finding based on the evidence that RUSS had "access" to New Line's copyrighted material. "Access" is defined as seeing, or having a "reasonable opportunity" to see, the copyrighted work, "[i]n other words having the opportunity, to copy ." *Intersong–USA v. CBS, Inc.,* 757 F.Supp. 274, 281 (S.D.N.Y.1991) (collecting cases); *Kamar Int'l v. Russ Berrie and Co.,* 657 F.2d 1059, 1062 (9th Cir.1981) ("Proof of access requires only an opportunity to view or copy plaintiff's work.") (citing 3 *Nimmer on Copyright,* § 13.02[A] at 13–11 (1981)); *accord Kerr v. New Yorker Magazine,* 63 F.Supp.2d 320, 324 (S.D.N.Y.1999); *Paramount Pictures Corp. v. Carol Publ'g Group,* 11 F.Supp.2d 329, 332 (S.D.N.Y.), *aff'd,* 181 F.3d 83 (2d Cir.1999). Here, even though I conclude that RUSS had "access" as defined, I have no satisfactory proof before me that anyone at RUSS had any awareness, belief or intention to infringe the New Line rights flowing from Freddy Krueger or the Nightmare motion pictures. Although innocent infringement does not constitute a defense to liability, it bears directly, as observed hereafter, on the issue of damages. *See 4 Nimmer on Copyright,* § 13.08, 13–279 ("In actions for statutory copyright infringement, the innocent intent of the defendant will not constitute a defense to a finding of liability. It may, however, bear upon the remedies available against such a defendant.").

Pursuant to 15 U.S.C. § 504(b), New Line is generally entitled to recover its actual damages (if any), as well as the profits made by RUSS resulting from the copyright infringement. However, under § 504(c)(1), New Line has opted to recover statutory damages.[2] "In the ordinary case

2. As New Line's counsel stated in his closing remarks, "We're asking you for statutory

of statutory damages, the Copyright Act sets the limits of possible recovery at not less than $500 and not more than $20,000." *N.A.S. Import, Corp. v. Chenson Enterprises, Inc.,* 968 F.2d 250, 252 (2d Cir. 1992). While New Line argues that because RUSS' infringement was "willful," and I should use the discretion conferred on me by § 504(c)(1) to increase any award up to $100,000, as observed earlier, however, I do not so find and decline to award such damages.

■ New Line's statutory damages should be commensurate with the actual damages incurred and, thus, the proper departure point is the RUSS' stipulated gross revenue of $49,669. *See, e.g., Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.,* 670 F.Supp. 1133, 1140 (E.D.N.Y.1987) (holding statutory damages should bear relation to actual damages suffered), *aff'd,* 862 F.2d 304 (2d Cir.1988). In calculating a damage award, "[T]he infringer's profits are calculated as the gross sales of infringing goods minus the costs that the infringer proves are attributable to the production and sale of those goods." *Hamil America, Inc. v. GFI,* 193 F.3d 92, 104 (2d Cir.1999), *cert. denied,* 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000). "Every infringer shoulders the burden of demonstrating a sufficient nexus between each expense claimed and the sales of the unlawful goods." *Id.* at 107 (internal citations and marks omitted).

Thomas Sancetta, Director of Sales Support at RUSS, whose testimony I credit, testified regarding RUSS' profit and loss ("P & L") statement[3] pertaining to sales of the Ghostly Gasher and that he prepared it using the "full absorption" method, which permits the defendant to deduct all overhead expenses in the same percentage as the sales of the infringing goods bears to its total sales.[4] *See, e.g., Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d 45, 54 (2d Cir.1939) (Hand, J.); *Warner Bros., Inc. v. Gay Toys, Inc.,* 598 F.Supp. 424, 428–29 (S.D.N.Y.1984); *Stevens Linen Assocs., Inc. v. Mastercraft Corp.,* 79 Civ.2016 (CBM), 1980 WL 1174, at *4–5 (S.D.N.Y. Dec. 17, 1980), *modified on other grounds,* 656 F.2d 11 (2d Cir. 1981).

I find that RUSS, having established a sufficient nexus between the expenses claimed and the sale of the Ghostly Gasher, may appropriately deduct said ex-

---

damages in that area We're asking for $100,000 in that regard." (Tr., dated April 24, 2001, at 186.) I cite these remarks because plaintiff's proposed findings of fact and conclusions of law begins its recitation of damages by citing to 17 U.S.C. § 504 (providing for recovery of plaintiff's actual damages and infringer's profits), but, subsequently, stating, "Given the willful nature of the infringement by Berrie, the court in its discretion may (and in this case should) increase the award of statutory damages to a sum of not more than $100,000, the statutory maximum at the time of the infringement." Pl.'s Proposed Findings of Fact & Conclusions of Law, at ¶ 47 (citing 17 U.S.C. § 504(c)(1) and § 504(c)(2)).

3. The P & L statement is in evidence as Plaintiffs' Exhibit 38 and Defendant's Exhibit 8.

4. As Judge Knapp stated in *Gay Toys,* "[U]nder the law of this Circuit, the full absorption approach is the correct accounting method." *Id.* at 428. "For example, if defendant had bought new machinery to produce the infringing toys, this would be deductible under either [the incremental or full absorption] approach. However, if it had used the same [previously owned] machinery to produce the infringing items that had been used to produce noninfringing items, the costs of operating and maintaining such machinery would be deductible under the full absorption approach (to the extent that the machinery was used for the infringing items); however, under the incremental approach, no deduction at all would be allowed for such costs." *Id.* at 428 n. 2.

penses reflected on the P & L statement, including direct selling, sales support, shipping, administrative (which Sancetta testified includes customer service, computer operations, invoicing), design and product development, advertising, taxes [5] and other general expenses, including "bad debt." *Cf. Kamar Int'l, Inc. v. Russ Berrie and Co., Inc.*, 752 F.2d 1326, 1332 (9th Cir. 1984).

I observe that New Line did not dispute Sancetta's methodology, calculations or conclusion that the net profits after RUSS' deductions on the Ghostly Gasher totaled $3,485. However, one item on the P & L, legal expenses in the amount of $623, may not be deducted, *see, e.g., John B. Stetson Co. v. Stephen L. Stetson Co.*, 58 F.Supp. 586, 592 (S.D.N.Y.1944), and thus the net profit is $4,108. Accordingly, I award New Line $4,108.

■ New Line also seeks damages pursuant to 15 U.S.C. § 1114 predicated upon defendant's admitted trademark infringement.[6] Recovery of damages under the Lanham Act requires evidence of actual confusion or, in the alternative, "willful deception" or bad faith on the part of RUSS. *See George Basch Co., Inc. v. Blue Coral, Inc. .*, 968 F.2d 1532, 1537 (2d Cir. 1992). Given my conclusion that RUSS did not have actual knowledge of the Fred-

dy Glove or of the "Nightmare" motion pictures, and, further, the total absence of any evidence regarding actual consumer confusion or bad faith, New Line is not entitled to trademark damages.[7] For the same reasons, New Line's claim of common law unfair competition, based on the same conduct and consisting of what (even plaintiff recognizes) are essentially the same legal elements,[8] also fails. *See W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 576–577 (2d Cir. 1993) ("[S]tate law cause of action for unfair competition shares many common elements with the Lanham Act ... and trademark infringement ... including proof of actual confusion to recover damages...."); *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 408 (2d Cir.1997).

■ Finally, an award of attorney's fees, costs and expenses on both the copyright and trademark claims is within the Court's discretion. *See* 17 U.S.C. § 505 (copyright); *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 523–524, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (copyright); 15 U.S.C. § 1117 (trademark); *Quaker State Oil Ref. Corp. v. Kooltone, Inc.*, 649 F.2d 94, 95 (2d Cir.1981) (per curiam) (trademark); *see also Springs Mills, Inc. v. Ultracashmere House Ltd.*, 724 F.2d 352, 357 (2d Cir. 1983) (trademark). On this record of innocent infringement, good faith litigation and

---

5. *See, e.g., L.P. Larson, Jr., Co. v. William Wrigley, Jr., Co.*, 277 U.S. 97, 99–100, 48 S.Ct. 449, 72 L.Ed. 800 (1928) (rejecting deduction of taxes for a willful infringer but holding that deductibility depends on circumstances); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 665 (2d Cir.1970) (allowing defendants to deduct income tax payments despite willful infringement); *In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 566–567 (2d Cir.1994) (holding non-willful infringer entitled to deduct taxes paid on its "innocently-acquired unlawful profits").

6. New Line's dilution and § 1125 claims were withdrawn and the record reflects a consent

injunction with regard to further sales, marketing, etc., of the Ghostly Gasher by RUSS. (Tr., dated April 24, 2001, at 47–48.)

7. Given my findings, New Line is not entitled to treble damages pursuant to 15 U.S.C. § 1117(b).

8. For example, plaintiffs' counsel stated, "[T]he elements of the unfair competition and trademark infringement under the Lanham Act are virtually identical except that a plaintiff must also establish bad faith." (Tr., dated April 24, 2001, at 50–51.)

RUSS' ignored request for a sample of the Freddy Glove to evaluate possible infringement, I decline to award fees, costs or expenses. *See, e.g., Hair Assocs., Inc. v. National Hair Replacement Servs., Inc.,* 987 F.Supp. 569, 596–597 (W.D.Mich.1997) (holding fee award inappropriate where defendants attempted to avoid infringement).

In sum, I observe rather colloquially that the evidence put before me in no way suggests that RUSS deliberately "knocked-off" the Freddy Glove or unlawfully and willfully attempted to line its pockets by riding on the coattails of plaintiffs' successful products. Quite simply, there is no showing of bad faith in the acquisition, marketing or sale of the Ghostly Gasher.

The foregoing constitute the Court's findings of fact and conclusions of law.

Submit proposed final judgment on notice consistent with this Opinion and Order.

So ordered.