James W. NEWTON, Jr. dba
Janew Music, Plaintiff,

v.

Michael DIAMOND, et al., Defendants
No. CV 00–4909 NM(MANx).

United States District Court,
C.D. California.

May 21, 2002.

Jeffrey Alan Berchenko, Berchenko & Korn, San Francisco, CA, Alan Michael Korn, Alan M. Korn Law Offices, San Francisco, CA, for James W. Newton, Jr dba Janew Music.

Adam F. Streisand, Daniel J. Friedman, Joseph Geisman, Loeb & Loeb, Los Angeles, CA, for Michael Diamond, Adam Horowitz, Adam Yauch dba Beastie Boys, Capitol Records Inc, Grand Royal Records Inc, Universal Polygram International Publishing Inc, Brooklyn Dust Music, an entity of unknown origin, Mario Caldato, Jr.

Adam F. Streisand, Loeb & Loeb, Los Angeles, CA, Jeffrey D. Ullman, Ullman Furhman Broeman & Platt, Morristown, NJ, for Janus Films, LLC, Criterion Collection, Voyager Publishing Company Inc.

Barry E. Mallen, Manatt Phelps & Phillips, Los Angeles, CA, Steven M Hayes, David R. Baum, Parcher Hayes & Snyder, New York, NY, for Sony Music Ent Inc, BMG Direct Marking Inc., the Columbia House Company, an entity of unknown origin.

## ORDER

MANELLA, District Judge.

### 1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The Beastie Boys, an alternative rock and hip-hop band, and their business asso-

ciates ("Defendants") sampled a six-second, three-note sequence of a flute composition composed and performed by James W. Newton, Jr. ("Plaintiff"). Plaintiff concedes that Defendants licensed the sound recording of his work, but alleges that Defendants' use of the sample infringed upon the underlying musical composition. Both parties have filed motions for summary judgment.

## II. FACTS

This case involves sampling. "The practice of sampling portions of pre-existing recordings and compositions into new songs is apparently common among performers of the genre known as rap.... Musicians sample pre-existing works either digitally, by lifting part of a song from a pre-existing master recording and feeding it through a digital sampler, or by hiring musicians who re-play or re-sing portions of the pre-existing composition." *Williams v. Broadus*, No. 99 Civ. 10957 MBM, 2001 WL 984714, at *1 n. 1 (S.D.N.Y. Aug.27, 2001).

Plaintiff, a flautist and composer, is the sole author of the musical composition *Choir*, which was registered with the Copyright Office in 1978. Defendants' Statement of Uncontroverted Facts ¶ 1; Plaintiff's Statement of Genuine Issues ¶ 1; Plaintiff's Statement of Uncontroverted Facts ¶ 1; Defendants' Statement of Genuine Issues ¶ 1. Defendants assert that *Choir* is one movement of a multi-movement musical composition titled *The Change Suite*, registered by Plaintiff with the U.S. Copyright Office. Defendants' Statement of Uncontroverted Facts ¶ 1. Plaintiff asserts that *Choir* is one of multiple songs permissibly covered by a single copyright registration. Plaintiff's Statement of Genuine Issues ¶ 1. It is undisput-

ed that Plaintiff holds a valid copyright to the musical composition at issue in this case. Defendants' Reply Brief at 2. It is also undisputed that Plaintiff has no rights to the sound recording of his performance of *Choir*, having licensed it to ECM Records in 1981. First Amended Complaint ("FAC") ¶ 26, Ex. D.

On February 26, 1992, the Beastie Boys ("Defendants"), an alternative rock and hip-hop band, obtained a license from ECM Records to sample the copyrighted sound recording of Plaintiff's performance of *Choir*. Defendants' Statement of Uncontroverted Facts ¶ 3; Plaintiff's Statement of Genuine Issues ¶ 3.[1] Pursuant to their license, Defendants copied a three-note sequence with one background note, approximately six seconds long, from *Choir* and looped the passage throughout their song, *Pass the Mic*. Plaintiff's Statement of Uncontroverted Facts ¶ 4; Defendants' Statement of Genuine Issues ¶ 4; Korn Decl., Ex. 1, Track # 2 (*Pass the Mic*). *Choir* itself runs approximately four and a half minutes. *See* Korn Decl., Ex. 1, Track # 1 (*Choir*). It is undisputed that *Choir* and *Pass the Mic* "are substantially dissimilar in concept and feel, that is, in there [sic] overall thrust and meaning." *Id.*, Ex. 3. (Dobrian Report) at 16.

Defendants represent that the sample consists of a six-second segment in which the performer fingers a "C" above middle "C" on the flute, while singing the same "C," ascending one-half step to a "D-flat," and descending again to the "C." Defendants Statement of Uncontroverted Facts ¶ 6. Plaintiff concedes that Defendants sampled "melody and harmony created by interaction of the underlying flute note of C and the simultaneous vocalization of the notes C, D-flat, and C." Korn Decl., Ex. 5,

1. Defendants obtained "the irrevocable nonexclusive license and right to copy portions (if any) of the sound recording entitled *Choir* performed by James Newton...." FAC, Ex. G at 1; Korn Decl., Ex. 15 at 1.

Plaintiff's Response to Defendants' Interrogatory No. 1.[2] However, Plaintiff alleges that Defendants also sampled the unique musical sound and characteristics created by his distinctive performance techniques. *Id.*

It is undisputed that Defendants' license allowed them to sample the sound recording of Plaintiff's performance of *Choir.* FAC ¶ 26; Korn Decl., Ex. 15; Defendants' Statement of Uncontroverted Facts ¶¶ 3–4; Plaintiff's Statement of Genuine Issues ¶¶ 3–4; Plaintiff's Statement of Uncontroverted Facts ¶ 3; Defendants' Statement of Genuine Issues ¶ 3; Plaintiff's Motion at 3. However, Plaintiff contends that Defendants were required to obtain a separate license for derivative use of the copyrighted musical composition of *Choir.* Defendants' Statement of Uncontroverted Facts ¶ 3; Plaintiff's Statement of Genuine Issues ¶ 3; Plaintiff's Statement of Uncontroverted Facts ¶ 3; Defendants' Statement of Genuine Issues ¶ 3; Plaintiff's Motion at 3.

Plaintiff filed suit May 9, 2000, asserting claims for: 1) copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.;* 2) international copyright infringement in violation of the Universal Copyright Convention; 3) reverse passing-off in violation of the Lanham Act, 15 U.S.C. § 1125, *et seq.;* and 4) misappropriation of identity in violation of the Lanham Act. The court dismissed Plaintiff's third and fourth claims pursuant to Fed.R.Civ.P. 12(b)(6). *See* Court's Order Granting Defendants' Motion to Dismiss, September 12, 2000.

Defendants filed their motion for summary judgment on Plaintiff's remaining two claims for copyright infringement February 28, 2002. Defendants argue that the portion of the musical composition *Choir* they sampled cannot be protected as a matter of law. In the alternative, Defendants argue that any misappropriation is *de minimis,* and thus not actionable as copyright infringement. Defendants also contend that Plaintiff cannot seek extraterritorial damages because he cannot establish that Defendants infringed upon his copyright. Finally, Defendants argue that any infringement claim and damages Plaintiff may have are limited by the three-year statute of limitations.

Plaintiff filed a motion for summary judgment March 12, 2000. Plaintiff argues that the portion of *Choir* Defendants sampled is legally protectable, and that Defendants' alleged infringement is not *de minimis.* Plaintiff also argues that he is entitled to injunctive relief.

### III. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corporation v.*

---

**2.** Despite this concession, Plaintiff inexplicably disputes Defendants' proposed uncontroverted fact concerning the notes they sampled. However, he provides no description in his Statement of Genuine Issues of the notes at issue. The portions of the record cited by Plaintiff do not contradict Defendants' de-scription of the notes they sampled. Moreover, the court's inspection of the sheet music and sound recording confirms that, as Defendants allege and Plaintiff concedes, Defendants sampled a portion of the score in which the performer fingers a "C" note on the flute while singing C—D-flat—C.

*Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1). Determinations of credibility, however, should be left to the trier of fact. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 507 (9th Cir.1992). Accordingly, issues that turn on such determinations should not be resolved at the summary judgment stage. *See id.; see also Palacios v. City of Oakland,* 970 F.Supp. 732, 738 (N.D.Ca.1997) ("In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence[.]").

In a trio of 1986 cases, the Supreme Court clarified the applicable standards for summary judgment. *See Celotex, supra; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The governing substantive law dictates whether a fact is material; if the fact may affect the outcome, it is material. *See id.* at 248, 106 S.Ct. at 2510. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, it must satisfy its burden with affirmative, admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When assessing whether the non-moving party has raised a genuine issue, the court must believe the evidence and draw all justifiable inferences in the non-movant's favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient to create a genuine issue of material fact. *Id.* at 252, 106 S.Ct. at 2512. As the Supreme Court explained in *Matsushita,*

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Id.,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (citations omitted).

To be admissible for purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue. Fed.R.Civ.P. 56(e). Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

## IV. DISCUSSION

### A. Copyright Act Claim

*1. The Difference Between the Musical Composition and the Sound Recording*

■ Sound recordings and their underlying musical compositions are separate

works with their own distinct copyrights. *See* 17 U.S.C. § 102(a)(2), (7). "When a copyrighted song is recorded on a phonorecord, there are two separate copyrights: one in the musical composition and the other in the sound recording." *T.B. Harms Co. v. Jem Records, Inc.*, 655 F.Supp. 1575, 1576 n. 1 (D.N.J.1987). *See also BTE v. Bonnecaze*, 43 F.Supp.2d 619, 627 (E.D.La.1999); *Jarvis v. A & M Records*, 827 F.Supp. 282, 292 (D.N.J.1993) ("Under the Copyright Act, there is a well-established distinction between sound recordings and musical compositions."). The rights of a copyright in a sound recording do not extend to the song itself, and *vice versa.* *BTE*, 43 F.Supp.2d at 627; *T.B. Harms*, 655 F.Supp. at 1576 n. 1.

■ It is undisputed that Plaintiff has no rights to the *sound recording* of *his* performance of *Choir*, having licensed it for a fee to ECM Records, who, in turn, granted Defendants a license to sample it. FAC ¶ 26, Ex. D. Defendants' Statement of Uncontroverted Facts ¶ 3; Plaintiff's Statement of Genuine Issues ¶ 3. However, Plaintiff contends that Defendants' sampling infringed upon his underlying musical composition. Accordingly, the court must first determine what elements of Plaintiff's work are protected by his copyright in the musical composition, as opposed to those protected by the copyright in the sound recording, and "filter out" the latter. *See Sony Pictures Enter., Inc. v. Fireworks Enter. Group, Inc.*, 156 F.Supp.2d 1148, 1157 (C.D.Cal.2001). "Because only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, [courts use] analytic dissection to determine the scope of copyright protection before works are considered as a 'whole.'" *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994).

Plaintiff argues that analytic dissection is not required, because copyright law automatically protects copyrightable expression reduced to a musical score or phonorecord. Plaintiff's argument begs the question as to what is protected by his copyright over the musical composition, as opposed to ECM's copyright over the sound recording. Had Plaintiff held both copyrights, analytic dissection would be unnecessary. However, as Plaintiff cannot base his infringement action on elements unique to the sound recording, the court must first determine precisely what is protected by Plaintiff's copyright over his musical composition.

A musical composition consists of rhythm, harmony, and melody, and it is from these elements that originality is to be determined. 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.05[D]. A musical composition captures an artist's music in written form. A. Dustin Mets, *Did Congress Protect the Recording Industry Into Competition? The Irony of the Digital Performance Right in Sound Recordings Act*, 22 U. Dayton L. Rev. 371, 372–73 (1997). A musical composition's copyright protects the generic sound that would necessarily result from any performance of the piece.

Sound recordings are "works that result from the fixation of a series of musical, spoken or other sounds . . . ." *T.B. Harms*, 655 F.Supp. at 1576 n. 1 (quoting 17 U.S.C. § 101). "The sound recording is the aggregation of sounds captured in the recording while the song or tangible medium of expression embodied in the recording is the musical composition." *Id.* (citing H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 56, reprinted in 1976 U.S.Code Cong. & Ad. News 5659, 5669). *See also BTE*, 43 F.Supp.2d at 627–28; *Jarvis*, 827 F.Supp. at 292. In other words, the sound recording is the sound produced by the

performer's rendition of the musical work. *See generally Nimmer on Copyright* § 2.10.

Plaintiff's musical composition of the sample at issue consists of a "C" note played on the flute while the performer sings a "C," ascends one-half step to "D-flat," and descends again to the "C." The score is not further orchestrated and contains neither time nor key signatures.[3] The score also calls for between 90 and 180 seconds of improvisation. The C—D-flat—C sequence appears only once in the composition.

Plaintiff's expert, Christopher Dobrian, concludes that following the "special playing technique described in the score" will necessarily create unique expression. Korn Decl., Ex. 3 (Dobrian Report) at 12. Dobrian acknowledges, however, that the technique of vocalization—simultaneously singing and playing the flute—is not unique to Plaintiff's musical composition. *Id.* at 14. Similarly, Plaintiff's other expert, Oliver Wilson, acknowledges that "vocalization performance techniques" have been used in Africa and were prevalent throughout the Twentieth Century, particularly in avant-garde music. Korn Decl., Ex. 3 (Wilson Report) at 20–21 ("[M]ultiphonic and particularly vocalization of performance techniques exist as part of the performance tradition of specific SubSaharan African cultures and has [sic] also been clearly established in the second half of the Twentieth century as a relatively common performance practice in the avant-garde music which grows out of the cultivated Western written music tradition.").

Defendants' expert, Lawrence Ferrara, confirms that vocalization involving a flute may be found in numerous flute pieces that pre-date Plaintiff's 1978 musical com-

position. *See* Streisand Decl., Ex. 3 (Ferrara Report) at 7–8. For example, acclaimed composer George Crumb's 1971 composition "Voice of the Whale" contains the same technique. *See id.,* Ex. 3 (Ferrara Report) at 7–8, Ex. C (recordings of Crumb's work). Like Plaintiff's technique in *Choir,* Crumb plays one note on the flute while simultaneously singing the note into the flute, ascending a half-step, and returning to the note being played. *See id.,* Ex. 3 (Ferrara Report) at 7–8, Ex. C (recordings of Crumb's work). Numerous other composers have used vocalization to create a distinctive sound. *See id.,* Ex. 3 (Ferrara Report) at 7–8. *See also id.,* Ex. D, Track #1 (Robert Dick, *Afterlight*); Track #2 (African folk song *Bengsimbe* of the Fula people); Track #3 (Toru Takemitsu, *Voice*); Track #4 (*Domino,* recorded by Roland Kirk); Tracks #5 & #6 (*My Ship,* recorded by Roland Kirk); Track #7 (*We'll Be Together Again,* recorded by Roland Kirk); Track #8 (*People,* recorded by Roland Kirk); and Track #9 (*Szerelem, Szerelem,* Hungarian Folk Song). Moreover, academic literature recognized the technique of singing while playing the flute before Plaintiff wrote and performed *Choir. See, e.g., id.,* Ex. B (DAVID COPE, NEW MUSIC NOTATION at 67 (1976); ROBERT DICK, THE OTHER FLUTE: A PERFORMANCE MANUAL OF CONTEMPORARY TECHNIQUES at 135 ("Singing and Playing Simultaneously") (1975); THOMAS HOWELL, THE AVANT-GARDE FLUTE: A HANDBOOK FOR COMPOSERS AND FLUTISTS at 30 ("Special Effects: Singing with the Flute") (1974)).

Plaintiff largely ignores the distinction between musical compositions and sound recordings. Plaintiff argues only that his own techniques render his musical composition unique, as they contribute "some-

---

**3.** The notation "senza misura" (without measure) and "largo" (slowly, broadly) appear above the first note, along with a footnote

indicating that the performer must sing into the flute and finger simultaneously.

thing more than a merely trivial variation, something recognizably [his] own" to a prior expression. *ZZ Top v. Chrysler Corp.*, 54 F.Supp.2d 983 (W.D.Wa.1999). *See also Tempo Music v. Famous Music Corp.*, 838 F.Supp. 162, 168–69 (S.D.N.Y. 1993).[4] While Plaintiff concedes that he did not invent generic vocalization—simultaneously singing and playing the flute— he argues that his unique approach to vocalization, in particular using breath control to emphasize certain notes, which his expert Wilson terms "the Newton technique," renders *Choir* original. Plaintiff also identifies his technique of overblowing the "C" note to produce multiple pitches ("multiphonics") as the source of his work's originality. Korn Decl., Ex. 3 (Wilson Report) at 20.

However, neither the "Newton technique" nor any mention of overblowing the "C" note appears on the musical composition. The musical composition contains only a notation that the piece is performed using generic vocalization, simultaneously singing and playing the flute. Plaintiff concedes as much, acknowledging that all elements of his performance are not reflected in the musical composition. Plaintiff's Opposition Brief at 15. Plaintiff's expert Wilson confirms that the copyrighted score of *Choir* does not contain notations for all of the "musical subtleties" that the performer of the work "will make in the work's *performance.*" Korn Decl., Ex. 3 (Wilson Report) at 20–21 (emphasis added). Moreover, Wilson acknowledges that the copyrighted score of *Choir* does not delineate the techniques necessary to reproduce Plaintiff's "unique sound." *See id.* at 21.

Plaintiff's expert, Christopher Dobrian, opines that because every composer of a musical work assumes that the performer will add his or her individual interpretation to the notation, "[t]he contribution of the performer is often so great that s/he in fact provides just as much musical content as the composer." Korn Decl., Ex. 3 (Dobrian Report) at 15. Dobrian concludes that "[i]n Newton's own performance of his composition *he* uses breath control to modify the timbre of the sustained flute note rather extremely ... and *he* uses portamento to glide expressively from one pitch to the other in the vocal part." *Id.* at 15 (emphasis added). Dobrian concedes that "[n]either the timbral effect nor the portamento is notated in the score." *Id.* at 15. Dobrian further emphasizes that "Mr. Newton blows and sings in such a way as to emphasize the upper partials of the flute's complex harmonic tone," but acknowledges that "such a modification of tone color is not explicitly requested in the score." *Id.* Indeed, Dobrian concludes that Plaintiff's allegedly unique sound "is the result of Mr. Newton's refined breath control for interpretive use of tone color," which Plaintiff's expert Wilson calls "the Newton technique." *Id.* at 14.

As Plaintiff's specific techniques of performing *Choir, viz.,* "the Newton technique"—Newton's practice of overblowing the "C" note to create a multiphonic sound, and his unique ability to modify the harmonic tone color—do not appear in the musical composition, they are protected only by the copyright of the sound recording of Plaintiff's performance of *Choir,* which Defendants licensed. Accordingly, Plaintiff's copyright protects only the sound that would invariably result from playing the "C" note on the flute while singing into the flute a "C," ascending to a "D-flat," and descending to the "C."

---

4. Citing *Tempo Music,* 838 F.Supp. at 168–69, Plaintiff argues that innovative sounds in jazz may be protected by copyright. Regardless, Plaintiff licensed the innovative sounds created by his technique in performance to Defendants.

At oral argument, Plaintiff's counsel suggested that any flautist performing the six-second segment would produce sounds comparable to those achieved by Plaintiff. This proposition is both unsupported by the record and contradicted by Plaintiff and his experts. Throughout this litigation, Plaintiff has insisted that the harmonic sounds and timbral effects achieved in his composition are a result of his unique performing techniques. His expert Dobrian confirms this. He cannot now claim that any flautist fingering a C and blowing C—D-flat—C would achieve the unique sound that results from his use of techniques not notated in the score.[5]

In sum, what makes Plaintiff's performance "unique," according to his own experts, is the combination of performance techniques Plaintiff employs in the execution of his composition, consisting largely of techniques not notated in the score.[6] It is undisputed that Plaintiff could have notated "overblowing," as he did in other compositions. *See, e.g.,* FAC, Ex. B (*Toru*) at 17 (containing notation to "overblow harmonics"). Therefore, whether Defendants' sample sounds like Plaintiff's performance of *Choir* is not relevant to the court's inquiry. Rather, the court must decide whether Defendants' creation of a three-note sequence with one background note from a six-second segment of *Choir* constitutes copyright infringement of the underlying musical composition.

### 2. The Sample of Plaintiff's Musical Composition Is Unprotectable

■ At the outset, Plaintiff argues that his copyright creates a presumption of originality which Defendants must refute. However, this presumption applies only to whether the copyright itself is valid. *North Coast Indus. v. Jason Maxwell, Inc.,* 972 F.2d 1031, 1033 (9th Cir.1992) ("Under our copyright law, the registration of the copyright certificate itself establishes a prima facie presumption of validity of the copyright in a judicial proceeding. . . ."). *See also Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 488–89 (9th Cir.2000) ("Registration is prima facie evidence of the validity of a copyright."); *Smith v. Jackson,* 84 F.3d 1213, 1219 (9th Cir.1996) (holding that presumption of originality not relevant to "scenes a faire" inquiry, because "[a] Certificate of Registration only creates a rebuttable presumption of originality applicable to a defendant's attack on the originality applicable to a defendant's attack on the *validity* of a plaintiff's copyright.") (emphasis in original). In the instant case, Defendants do not dispute that Plaintiff's copyright over the musical composition is valid. Even were the validity of Plaintiff's copyright at issue, the presumption of originality applies only if "the judicial proceeding is commenced within five years of the copyright's first publication." *North Coast Indus.,* 972 F.2d at 1033. Plaintiff registered his copyright August 4, 1978 and commenced

---

**5.** The allegations of the original complaint further confirm that Plaintiff considers his playing techniques unique and not susceptible to copyright. Plaintiff's claims for trademark infringement (ultimately dismissed) focused upon "the Newton signature" consisting of "unique musical characteristics" which create his "unique musical sound." Complaint ¶¶ 65–67. As none of the compositional characteristics—vocalization or three half-steps—are, individually or combined, "unique,"

Plaintiff could only have been referring to his unique performance techniques.

**6.** Plaintiff argues that this techniques are not inconsistent with the score. This is not the point. A trill may be consistent with performance techniques of a particular piece, but if The Beastie Boys had sampled an unnotated trill, it could not seriously be argued that their doing so infringed on the underlying musical composition that contained no such trill.

this suit over 20 years later on May 9, 2000.

■ The protectability of elements of a copyrighted work is a question of law for the court. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348–51, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Although the musical composition of *Choir* is protected as a complete work, not every element of a song is *per se* protected. *See, e.g., Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.1992). Copyright protection extends only to those components of the work that are original and non-trivial. *Feist,* 499 U.S. at 348–51, 111 S.Ct. 1282. In assessing originality, courts must be "mindful of the limited number of notes and chords available to composers and the resulting fact that common themes frequently appear in various compositions, especially in popular music." *Gaste v. Kaiserman,* 863 F.2d 1061, 1068 (2d Cir.1988). *See also Jarvis,* 827 F.Supp. at 291 ("Easily arrived at ... chord progressions are usually not copyrightable.").

■ In the instant case, Plaintiff's three-note sequence (C—D-flat—C) with one background note (C), segregated from the entire piece, cannot be protected, as it is not original as a matter of law. Many courts have found that nearly identical or more substantial samples are not susceptible to copyright protection. In *Jean v. Bug Music, Inc.,* No. 00 Civ 4022(DC), 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002), the defendant allegedly copied a three-note sequence consisting of "C," followed by a "B-flat," followed by another "C," accompanied by the lyric "clap your hands." The court held that this excerpt of the song at issue could not be protected by the plaintiff's copyright "because the sequence of the three notes and the lyrics lack the requisite originality." *Id.* at *5. The court recognized that the musical note sequence "C"—"B-flat"—"C" appears commonly in music, rendering the sequence not susceptible to copyright protection. *Id.* at *6. The court further found that the three-word lyric "clap your hands," either standing alone or in combination with the music, was too common to render the otherwise unoriginal three-note sequence original.

The facts of *Jean* are strikingly similar to the instant case—a three-note sequence in which the first and third notes are identical and the second note is a half-step away. Unlike the snippet in *Jean,* however, Plaintiff's three-note sequence is unaccompanied by any lyrics. The vocalization notated in the score is, as Plaintiff concedes, a commonly used technique. Just as the *Jean* court found a commonly used word phrase insufficient to render the three-note sequence original, this court finds the widely used vocalization technique insufficiently original to render the three-note segment protectable.[7]

In *McDonald v. Multimedia Entertainment, Inc.,* 20 U.S.P.Q.2d 1372, 1991 WL 311921 (S.D.N.Y.1991), the court found that the three-note sequence the defendant allegedly misappropriated from the plaintiff's jingle could not be protected by copyright. The court noted the "absurdity" of Plaintiff's claim, given that the three-note sequence is a "common and much-used tone in traditional western music." *Id.* at 1375, 1991 WL 311921. Similarly, in *Tisi v. Patrick,* 97 F.Supp.2d 539 (S.D.N.Y. 2000), the court found that the plaintiff's claim of copyright infringement was based entirely upon non-protectable elements of his song, *viz.,* the key of A major, the tempo, a chord structure/harmonic com-

---

7. Plaintiff attempts to distinguish *Jean* by arguing that the court did not assess the distinctiveness of the notes and lyrics together. However, the court clearly held that "the lyrical phrase and the three notes are so common and unoriginal that even when they are combined they are not protectable." *Jean,* 2002 WL 287786, at *6.

mon to rock music, the guitar rhythm, and the fact that the chords of both songs are in "root" position.

In *Intersong–USA v. CBS, Inc.,* 757 F.Supp. 274, 282 (S.D.N.Y.1991), the court held that the defendants had not copied "protectable expression" contained in plaintiff's copyrighted song. The plaintiff alleged that the defendants had copied his descending scale step motive, but the court found this to be a "commonly used compositional device," citing the example of "Twinkle, Twinkle Little Star." *Id.* at 282. Although the defendants allegedly copied the plaintiff's structure patterns, use of a certain harmonic progression, and a recurring eighth-note rhythm, "these common elements are found in many other well-known songs." *Id.*

Plaintiff identifies cases in which courts have held that short sequences of notes may be protected by copyright. However, those cases involved sequences consisting of more than three notes. In *Baxter v. MCA, Inc.,* 812 F.2d 421, 425 (9th Cir. 1987), for example, the defendant allegedly used the first six notes of Plaintiff's composition "Joy" to create the theme for the movie "E.T." and conceded that both his composition and the plaintiff's composition conveyed similar ideas. The court, rejecting the defendant's characterization of the sequence as necessarily consisting of only six notes, held that the sequence could be protected by the copyright laws. *Id. See also Fisher,* 794 F.2d at 434 n. 2 (defendants allegedly misappropriated first six bars of the song's 38 bars and used similar lyrics); *Jarvis,* 827 F.Supp. at 292 (defendants allegedly misappropriated "the last several minutes" of plaintiff's song's distinctive keyboard riff, as well as distinctive lyrics).

Cases finding that sequences of less than six notes could be qualitatively distinctive have involved: 1) sequences with accompanying lyrics; 2) sequences at the heart of the musical compositions; 3) sequences and lyrics that were repetitive; and/or 4) sequences that were based upon analyses of both the written composition and the sound recording. *See, e.g., Santrayll v. Burrell,* 39 U.S.P.Q.2d 1052, 1054 (S.D.N.Y.1996) (one measure "hook" and repetition of word "uh-oh" may be distinctive); *Elsmere Music, Inc. v. National Broadcasting Co.,* 482 F.Supp. 741, 744 (S.D.N.Y.1980) (four notes and phrase "I Love" at heart of copyrighted song may be distinctive). Plaintiff also relies upon cases holding that a few words or sounds may be distinctive. *See, e.g., Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.,* 30 U.S.P.Q.2d 1791, 1793–94 (S.D.N.Y.1994) (sounds "hugga-hugga" and "brrr" in Plaintiff's composition sufficient to warrant copyright protection). However, unusual words or sounds are necessarily more distinctive than a few generic notes of music.

Moreover, the reports of both Defendants' and Plaintiff's experts confirm that the main three-note sequence at issue— C—D-flat—C—is not original. Defendants' expert, Lawrence Ferrara, concludes that the portion of Plaintiff's musical composition that Defendants sampled is not original or unique, as "it is merely a common, trite, and generic three-note sequence, which lacks any distinct melodic, harmonic, rhythmic or structural elements." Streisand Decl., Ex. 3, (Ferrara Report) at 1. Ferrara concludes that "these three notes of music alone do not constitute an original or distinct piece of music" because "[b]y any conventional methodological approach, these three simple notes are insignificant, and utterly insufficient to constitute original expression." *Id.* at 1–2. In fact, the same three-note sequence with a sustained pitch "has been used over and over again by major composers in 20th Century music, particularly the '60s and '70s, just prior to [Plaintiff's] usage." Streisand Decl., Ex. 7

(Ferrara Depo.) at 171, Exs. 9–11. Specifically, Jacob Druckman used this "basic building block tool" in his 1972 Pulitzer Prize winning composition *Windows* and again in his 1976 composition *Other Voices,* as did Gyorgy Ligeti in his 1968 *String Quartet No. 2. Id.* at 171, Exs. 9–11.[8]

Plaintiff's expert Dobrian acknowledges that Plaintiff's musical composition "contains a simple 'neighboring tone' figure: C to D-flat and back to C." Korn Decl., Ex. C (Dobrian Report) at 11. Dobrian contends that a sequence of "simple" and "unremarkable" notes may be significant, like the sample at issue. *Id.* at 12. However, Dobrian's conclusion, based upon his "independent assessment" of the sample, does not benefit Plaintiff's position, as it focuses upon elements of Plaintiff's performance which are not notated in the score. Dobrian asserts that to the extent Plaintiff's performance techniques are not notated in the score they represent, "Newton's desired interpretation of the score." *Id.* at 16. He refers repeatedly to the "sound of Newton's playing," *id.* at 8, noting that the sound produced on the recording "is the result of Mr. Newton's refined breath control for interpretive use of tone color." *Id.* at 14. Elsewhere, he notes that "Mr. Newton blows and sings in such a way as to emphasize the upper partials of the flute's complex harmonic tone color," noting that "such a modification of tone color is not explicitly requested in the score." *Id.* at 15.

Dobrian's opinion is thus based on his assessment of the sound resulting from Mr. Newton's unique interpretation—including the use of portamento/glissando, and modified tone color—of a score that contains no notation of either. While it may be expected that every performer will impart some interpretive flavor to any piece, Dobrian's focus on the sonic effects achieved by Newton's unique performance prevents his opinion from addressing the primary issue before this court—the protectability of the elements of the composition itself, not the "richness and complexity" of the "timbral result" achieved through "Mr. Newton's desired interpretation of the score." *Id.* at 16. Moreover, Dobrian's insistence that each performer brings his own unique interpretation to any work undercuts his argument that the uniqueness of Plaintiff's performance is inherent in the three-note musical notation. Finally, to the extent Dobrian attempts to base his conclusion on the uniqueness of the notes and notated technique alone, as discussed above, neither the three-note sequence nor the vocalization technique—or the two in combination—are sufficiently original to be protectable.

Oliver Wilson's opinion is similarly unavailing to Plaintiff's position, as it is based upon elements of Plaintiff's performance. *See* Korn Decl., Ex. 3 (Wilson Report) at 20. Wilson repeatedly refers to "the Newton technique" as the "source" of the sample's originality. *See id.* "To be more precise, the Newton technique produces a musical event in which the component sounds resulting from the simultaneous singing of one or more pitches produced on the flute create a relatively dense cluster of pitches and ambient sounds that sometimes change over time." *Id.* Indeed, while Wilson acknowledges that vocalization was a common technique prior to Plaintiff's arrangement and performance of *Choir,* he concludes that *Plaintiff's*

---

8. Plaintiff criticizes Dr. Ferrara's report because it does not reference the sound recording of Plaintiff's performance of *Choir.* Plaintiff's Memorandum of Points & Authorities at 12. However, the sound recording is not at issue, as Plaintiff licensed his rights to the recording to ECM Records in 1981, and Defendants obtained a license from ECM in 1992 to sample from it.

*unique approach to vocalization* ("the Newton technique") renders the sample original. *Id.* Specifically, Wilson points to Newton's technique of combining vocalization with multiphonics. *Id.* "Newton's technique involves the exploitation of simultaneous usage of vocalization and multiphonics.... This technique is the source of Newton's ability to produce his unique sound and hence, in large part, constitutes his musical signature." *Id.* Wilson states that Plaintiff "is not simply using a technique that is common in contemporary musical practice, but rather creating a specific musical event in the composition *Choir* that reflects his specific artistic vision." *Id.* at 21. Accordingly, any originality of the sample comes from Plaintiff's particular performance techniques, which are not at issue in this litigation.

Plaintiff attempts to create a triable issue by citing the remaining portions of Dobrian's report. However, some of Dobrian's conclusions are beyond the scope of his expertise. Dobrian concludes that because Defendants obtained a license to use the recording and acknowledged Plaintiff as the source of the sample, it must be unique. *Id.* at 11. However, Dobrian provides no foundation for his conclusion that a sample is original merely because its author is acknowledged in a derivative work. For example, Dobrian does not contend that such attribution occurs in the music industry only with respect to original work. Nor is Dobrian qualified to render such an expert opinion, as he is proffered as an expert in music composition, not sampling practices by popular music artists. Indeed, Dobrian was retained to analyze the music at issue, not to draw legal conclusions based upon facts falling outside his area of expertise.

In sum, the relevant portion of Plaintiff's musical composition is not subject to copyright protection as a matter of law. While Plaintiff and his experts contend that the six-second segment—consisting of two notes in a three-note sequence with one background note—constitutes unique expression, their analyses rely upon sound elements created by Plaintiff's admittedly unique technique of performing *Choir*, utilizing performance elements not notated in the score. Plaintiff's performance techniques, however, are not at issue in this litigation, as Defendants obtained a license to sample the sound recording of Plaintiff's performance of *Choir*. After filtering out the performance elements, the court is left with a six-second snippet of Plaintiff's composition consisting of a fingered "C" note and a sung three-note sequence C—D-flat—C. Courts have held that such small and unoriginal portions of music cannot be protected by copyright. *See, e.g., Jean v. Bug Music, Inc.*, 2002 WL 287786 (S.D.N.Y. Feb.27, 2002). Accordingly, the sample at issue—a six-second, three-note sequence with a single background note, isolated from the sounds created by Plaintiff's performance techniques—cannot be protected as a matter of law.

### 3. Defendants' Sampling of Plaintiff's Work Is De Minimis

Even if Plaintiff could establish that this three-note sequence is subject to copyright protection, *Pass the Mic* and *Choir* are not substantially similar as a matter of law, as Defendants' alleged infringement was *de minimis*. To establish that the infringement of a copyright is *de minimis*, and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so trivial "as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir.1998) (citations omitted). No "substantial similarity [will] be found if only a small, common

phrase appears in both the accused and complaining songs ... unless the reappearing phrase is especially unique or qualitatively important." *Jean,* 2002 WL 287786, at *6 (citations omitted). A taking is *de minimis* if the average audience would not recognize the misappropriation. *Fisher v. Dees,* 794 F.2d 432, 435 n. 2 (9th Cir.1986).

Courts generally consider both quantitative and qualitative factors in determining whether a taking is *de minimis.* Courts follow this approach in cases involving "fragmented literal similarity," which exists when a small portion of the original work is copied into the new song. *Nimmer on Copyright* § 13.03[A][2]. In such cases, "where there unquestionably is copying, albeit of only a portion of [a] plaintiff's song, ... [t]he proper question to ask is whether the defendant appropriated, either quantitatively or qualitatively, 'constituent elements of the work that are original' such that the copyright rises to the level of an unlawful appropriation." *Jarvis,* 827 F.Supp. at 289–91.

A quantitative analysis focuses upon the amount of the copyrighted work that was allegedly copied, as those who appropriate large parts of another's copyrighted work may be liable for copyright infringement. *Id.* at 290–91. "The relevant question in copyright infringement cases is whether the segment in question constituted a substantial portion of the *plaintiff's* work, not whether it constituted a substantial portion of the defendant's work." *Id.* at 290 (emphasis added). Thus, it is not relevant that Defendants played the six-second snippet throughout their entire song, as the focus is on whether the sample comprises a substantial portion of *Plaintiff's* song. *Id. See also Williams v. Broadus,* No. 99 Civ. 10957 MBM, 2001 WL 984714, at *4 (S.D.N.Y. Aug.27, 2001) (fact that sample was replayed throughout allegedly infringing song irrelevant) (citing Nimmer on Copyright § 13.03[A][2]; *Twin Peaks Prod. v. Publications Int'l,* 996 F.2d 1366, 1373 (2d Cir.1993); *Warner Bros., Inc. v. American Broadcasting Co., Inc.,* 720 F.2d 231, 242 (2d Cir.1983); *Elsmere Music,* 482 F.Supp. at 741).

Courts also consider whether the sample is qualitatively important to the *plaintiff's* entire song.[9] "Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Baxter,* 812 F.2d at 423. "[Q]uantitatively insignificant infringement may be substantial if the material is qualitatively important to *plaintiff's* work." *Apple Computer, Inc. v. Microsoft, Corp.,* 821 F.Supp. 616, 624 (N.D.Cal.1993), *aff'd,* 35 F.3d 1435 (9th Cir.1994) (emphasis added). "[I]t is not the significance of the copied material in the allegedly infringing work that determines substantial similarity. Rather, it is the significance of such material in the work allegedly infringed that is important." *Williams v. Broadus,* No. 99 Civ. 10957 MBM, 2001 WL 984714, at *4 (S.D.N.Y. Aug.27, 2001) (citing Nimmer on Copyright § 13.03[A][2]; *Twin Peaks,* 996 F.2d at 1373; *Warner Bros.,* 720 F.2d at 242; *Elsmere Music,* 482 F.Supp. at 741). Accordingly, it is not relevant whether the sample was qualitatively important to Defendants' song.[10]

---

9. A sample may also be qualitatively important or unique standing alone. This court has already concluded that the sample is not original as a matter of law. *See* Section IV.A.2.

10. Throughout this litigation, the court has held that the proper focus is whether the sample is quantitatively or qualitatively important to Plaintiff's work, not Defendants' work. *See, e.g.,* Magistrate Judge's Order on Plaintiff's Motion to Compel Further Responses to Requests for Production, September 28, 2002, at 7–8.

In the instant case, Plaintiff may rely only upon those elements protected by his copyright over the musical composition—not those attributable to his performance of the piece or the sound recording—to establish that the sample is quantitatively or qualitatively important enough to be recognized by the average audience. *See Apple Computer*, 35 F.3d at 1443. Assuming *Choir* is a distinct song, as Plaintiff contends, Defendants copied a quantitatively insignificant amount of Plaintiff's work.[11] Defendants appropriated a six-second sample consisting of a three-note sequence from a musical composition that takes approximately four and a half minutes to play, *See* Korn Decl., Ex. 1, Track # 1 (*Choir*). Quantitatively, the sample is thus approximately 2% of the piece. Moreover, it is undisputed that the three-note sequence appears only once in the piece. Although Plaintiff argues that the snippet is "quantitatively significant," most of his argument and cases cited focus on qualitative factors. Courts have found similar or more substantial sequences quantitatively insignificant. *See, e.g., Jean*, 2002 WL 287786, at *7–8 (three-note sequence and lyric "clap your hands" not quantitatively significant to copyrighted song); *McDonald*, 20 U.S.P.Q.2d at 1375, 1991 WL 311921 (three-note sequence of proposed television show jingle not quantitatively significant to copyrighted song). Even *Baxter*, which held that alleged misappropriation of at least six notes in the theme to the movie "E.T." was not necessarily *de minimis*, based its holding on qualitative factors, recognizing that the sample was quantitatively small. *See Baxter*, 812 F.2d at 425 ("Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find simi-

larity."). Accordingly, Plaintiff must rely upon qualitative factors to establish that Defendants' sampling was not *de minimis*.

Plaintiff argues that the sample is distinctive because anyone familiar with *Choir* would instantly recognize its use throughout *Pass the Mic*. However, Plaintiff acknowledges that *Choir* and *Pass the Mic* "are substantially dissimilar in concept and feel, that is, in there [sic] overall thrust and meaning." *Id.*, Ex. 3. (Dobrian Report) at 16. Moreover, Plaintiff identifies no factors—separate and apart from those attributable to his unique performance techniques—that would render the three-note sequence qualitatively important to Plaintiff's entire composition of *Choir*. Plaintiff argues that Defendants' expert admitted that Defendants sampled a recognizable excerpt from the musical composition of *Choir*. *See* Korn Decl., Ex. 26 (Ferrara Depo.) at 251–52. However, Ferrara merely testified that someone listening to the *sound recording* of Plaintiff's performance of *Choir* may recognize the sample in Defendants' song. The issue is not whether someone might recognize the snippet as coming from Plaintiff's sound recording—for which Defendants obtained a license; the question is whether someone might recognize—from a performance of the notes and notated vocalization alone—the source as the underlying musical composition. As Dr. Ferrara notes, because both the note sequence and vocalization technique are common, any analysis of distinctiveness must necessarily come from the performance elements, not the musical composition. *See generally* Streisand Decl., Ex. 3 (Ferrara Report).

Citing the deposition of Michael Diamond, a member of The Beastie Boys, Plaintiff argues that Defendants concede

---

11. Were the trier of fact to conclude that *Choir* is simply one movement of the multi-movement song, *The Change Suite*, as Defen-

dants contend, this six-second, three-note sample would be even less quantitatively significant.

the sample is qualitatively significant. While Diamond testified that Defendants took the "best bit" of *Choir*, he also testified that the *sound* created by Plaintiff's distinctive performance is what makes the sample distinctive. *See* Korn Decl., Ex. 7 (Diamond Decl. at 78–80). The sound created by Plaintiff's distinctive performance techniques is not at issue in this litigation.

Plaintiff cites several cases in support of the proposition that a short sequence of notes can be qualitatively distinctive. However, as discussed above, cases that have survived summary judgment have involved larger portions of music than are at issue in this case. Moreover, these case have involved sequences with accompanying lyrics that are distinctive, sequences at the heart of the musical compositions, sequences that repeated throughout the composition, and/or an analysis of both the written composition *and* sound recording. *See* Section IV.A.1 at 15–16.[12]

In sum, Plaintiff identifies nothing distinctive about the three-note sequence taken from his musical composition. Neither the two notes in the three-note sequence, the common vocalization technique, nor the combination thereof imparts qualitative importance or distinctiveness to the six-second excerpt. Plaintiff cannot rely upon any allegedly unique sound elements created by his own performance of those three notes to establish its distinctiveness, as he licensed the right to the sound recording of that performance over 20 years ago. Neither Plaintiff nor his experts identify any elements of the musical composition itself, as opposed to those related to the sound recording, that make the three-note

sequence distinctive or qualitatively significant. The sequence contains no accompanying lyrics. Defendants' expert contends that the sample is not distinctive or memorable. *See* Streisand Decl., Ex. 3 (Ferrara Report). Plaintiff's experts do not contend that the sequence—devoid of the characteristics of Plaintiff's performance—is "the heart" of the composition or comprises a distinctive "hook." *See id.* at 24. Moreover, Plaintiff acknowledges that the three-note sequence appears only once in his composition.[13] In short, there is nothing about this sequence making it distinctive, and courts have found misappropriation of similar sequences to be *de minimis*. *See, e.g., Jean,* 2002 WL 287786, at *6–7. Accordingly, the court concludes that any use by Defendants was *de minimis* and cannot form the basis of a copyright infringement action.

### B. International Copyright Infringement Claim

■■■ Plaintiff alleges that he is entitled to damages for Defendants' "international copyright infringement," *viz.,* reproducing, distributing, and publicly performing *Pass the Mic* outside the United States. However, in order to recover for extraterritorial damages, "at least one alleged [act of] infringement must be completed entirely within the United States" that would subject the defendant to liability under the Copyright Act. *Los Angeles News Service v. Reuters Television Int'l Ltd.,* 149 F.3d 987, 992 (9th Cir.1998). As Plaintiff cannot establish a violation of the Copyright Act, his claim for extraterritorial damages fails as a matter of law.

---

**12.** *ZZ Top v. Chrysler Corp.,* 54 F.Supp.2d 983, 984–85 (W.D.Wa.1999) does not benefit Plaintiff's position. The court provided only a brief discussion of the facts and did not discuss the length of the sequence allegedly misappropriated. Clearly the sequence there was longer than that at issue here, as the court stated that a jury could find the sequence

distinctive "even if they were exposed to only six or eight seconds of each...." *Id.* at 985.

**13.** Mere recognizability of a *de minimis* taking is insufficient to create a triable issue. *See, e.g., Sandoval v. New Line Cinema Corp.,* 147 F.3d 215, 217 (2d Cir.1998).

**1260**

### C. Statute of Limitations

 Even were Plaintiff permitted to proceed on his copyright infringement claim, the Copyright Act of 1976 provides that "no civil action shall be maintained unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). A claim accrues when an act of infringement occurs, not when consequent damage is suffered. *Los Angeles News Service v. Reuters Television Int'l, Ltd.,* 149 F.3d 987, 992 (9th Cir.1998). Moreover, a plaintiff's right to damages is limited to those suffered during the statutory period for filing suit, regardless of when they may have been incurred. *Id. See also Roley v. New World Pictures, Ltd.,* 19 F.3d 479, 481 (9th Cir.1994).[14] Plaintiff alleges that Defendants have been infringing upon his work since they created *Pass the Mic* in 1991 or 1992. As Plaintiff filed suit April 9, 2001, however, he may seek damages only for acts of infringement that occurred after April 9, 1998.

### V. CONCLUSION

This case is distinct from many copyright infringement actions involving sampling. It does not involve Defendants sampling without a license both the sound recording and the musical composition of a work. Rather, Plaintiff licensed the rights to the sound recording of his performance of *Choir,* and Defendants obtained a license to sample from this sound recording, leaving the court to inquire only whether the three-note sequence of Plaintiff's musical composition, devoid of the distinctive sound elements created by his unique performance techniques, can be protected by copyright law. The court concludes that it cannot. Moreover, even were this six-second snippet subject to copyright protec-

tion, the court concludes that Defendants' use was *de minimis,* as the sample was neither quantitatively nor qualitatively significant to *Choir.* Accordingly, the court **GRANTS** Defendants' motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment.

IT IS SO ORDERED

---

14. Plaintiff argues that the court should disregard the Ninth Circuit's holding in *Roley* in favor of the Seventh Circuit's approach of tolling the statute of limitations in copyright infringement actions. While Plaintiff contends that the Seventh Circuit's approach is "the better rule," Ninth Circuit precedent is to the contrary.